[No. 25747. Department One. August 16, 1935.]

THE STATE OF WASHINGTON, *Respondent*, v. MERRITT
HUNTER, JR., *Appellant*.[1]

[1]Reported in 48 P. (2d) 262.

144

146

*Thos. L. O'Leary,* for appellant.

*Smith Troy, J. W. Graham,* and *E. A. Philbrick,* for respondent.

BEALS, J.—The defendant, Merritt Hunter, Jr., was by information charged with the crime of murder in the first degree, in that he, on the twenty-fifth day of November, 1934, shot and killed one Lillian Kanda. On his arraignment, defendant entered a general plea of not guilty and in addition a special plea in the following form:

"That said defendant was insane or mentally irresponsible at the time of the commission of the crime charged; and that said defendant has become sane or mentally responsible between the time of the commission of the crime and the time of trial."

The trial opened February 13, 1935, and on February 22 following, the jury returned a general verdict of guilty and a special finding that the death penalty be inflicted. Thereafter, defendant's motion for a new trial was overruled, and judgment was entered on the verdict, adjudging defendant guilty of the crime of murder in the first degree and directing the infliction of the death penalty. From the judgment so entered, defendant has appealed. The homicide was not denied,

appellant relying upon his special plea of mental irresponsibility.

Appellant assigns error upon certain questions propounded by the prosecution to prospective jurors upon their *voir dire,* upon the admission and exclusion of certain evidence, upon the giving of certain instructions and upon the refusal to give several instructions which he requested, upon the receiving of the verdict of the jury by the court, appellant excepting to the form thereof, upon the order denying his motion for a new trial, and upon the entry of the judgment appealed from.

Appellant was born in Thurston county in the month of June, 1914, and grew up in his parents' household in Thurston and neighboring counties. During the year 1926, appellant's father opened a combination gas station, auto repair shop and store on the Olympic highway, about four miles west of Olympia, where he has ever since been engaged in business. Lillian Kanda was the daughter of S. Kanda, a Japanese, and his wife, a white woman, and resided with her parents on the Olympic highway, not far from the gas station operated by appellant's father. She and appellant met while both were attending the Olympia high school, from which institution Lillian graduated in 1931. Appellant never completed his high school course.

The two young people were apparently mutually attracted one to the other and were frequently together, until the summer of 1934. During the spring of that year, appellant's parents became aware of the fact that their son was apparently infatuated with Lillian, whereupon they objected to appellant's association with her—not that they had any objection personal to the girl, who, it appears, was universally respected, they feeling, however, that appellant was too young to marry; and, in the second place, they objected to mar-

riage between persons of different races. Appellant's parents at this time had an interview with Lillian, during the course of which they informed her that they desired that the relations theretofore existing between her and their son should cease.

Appellant was disturbed because of his parents' objections to his association with Lillian, and shortly after the first of August, following an unpleasant scene at the gas station, he wrote Lillian a letter addressed "To my Lost Sweetheart," in which he stated, in effect, that his life had been ruined by his love for her; that he wished her the very best of luck; that he would always love her, and that she need not fear that he would ever injure her. The letter also contained a veiled intimation that appellant contemplated suicide. Shortly after the writing of this letter, appellant's parents sent him on a trip to Minnesota, whence he returned September 23. While absent on this journey, appellant and Lillian corresponded, but after his return he saw her rather infrequently.

On the evening of Saturday, November 17, Lillian and appellant were both present at a party, where they danced together. About midnight, Lillian, with her brother George, a girl named Norma Adams, and Bernard Tresner, a friend, left the dance, calling at a nearby restaurant for a light lunch. While the party was in the automobile, appellant appeared, opened the door and attacked Tresner, striking him once or twice.

November 22, appellant went to Tacoma to attend a boxing match. After the contest, he, with George Kanda and two other young men, sought some refreshment, indulging both in food and in intoxicating liquor. Appellant testified that he remembered nothing of what occurred after taking these drinks until he came to himself in the Thurston county jail, when he discovered that he was charged with murder.

From the testimony of other witnesses, it appears that appellant returned to his home on Saturday, the 24th, and that, about eleven o'clock on the evening of that day, he met Bernard Tresner on the streets of Olympia, whereupon he apologized to Tresner for having struck him on the previous Saturday. Appellant and Tresner then went to a dance, which they left about two o'clock Sunday morning, after which they had something to eat at an Olympia restaurant.

On this Saturday night, Lillian, with her parents and Norma Adams, attended a dance at Schneider's Prairie, after which Lillian, with several friends, went to Olympia, where they visited the house where one of the girl members of the party resided. After a short stay at this home, Lillian, Norma Adams and two young men drove down town, where they met appellant, with whom Lillian had a brief conversation. Thereafter, Lillian and her friends returned to the house they had previously visited, which Lillian and Norma left for the former's home about four-thirty o'clock in the morning. Tresner and appellant left Olympia in the former's car shortly after three o'clock a. m., appellant getting off at his father's gas station.

When Lillian and Norma reached the former's home, appellant stepped from an automobile parked nearby, and, after showing the girls a rifle which he was carrying, asked them to drive him to his home, about a mile distant. Appellant entered the front seat with Lillian; Norma occupying the rear seat. The girls were much alarmed at appellant's conduct and requested that he unload the rifle, whereupon he handed Norma six cartridges, later handing her the rifle. The girls were crying and evidently laboring under great excitement. Lillian drove the car to the Hunter station, whereupon appellant stated that he did not live there any more and turned the car back into the highway, the car being

then driven to a point near a gravel pit at the top of Mud Bay hill, between the Hunter gas station and Olympia.

At this point, Lillian and appellant left the car, engaging in close conversation, which Miss Adams was unable to hear, although she saw no evidence of a quarrel. Later, they returned to the car and conversed in a low tone. During the course of the conversation, Miss Adams overheard appellant threatening to kill himself, and also heard him ask Lillian if she did not want to go on the long trip with him. Appellant got out of and into the car twice, and at one time asked Miss Adams for the gun.

The party remained at the gravel pit almost three hours. Finally, appellant asked Miss Adams for a cartridge, with which he loaded the rifle. Before leaving the automobile for the second time, appellant bade the girls good-bye and wrote a note to his parents bidding them farewell, indicating that he contemplated suicide. Soon after this, appellant opened the car door, whereupon Lillian voluntarily and without any command from appellant left the car and started running toward the highway. Appellant called to Lillian and almost immediately thereafter fired at her, wounding her so severely that she fell to the ground. Appellant then walked to the place where she was lying, and shot her a second time. The wounds inflicted upon Lillian were mortal, and she died almost immediately.

Miss Adams then drove the car to Lillian's home and told Lillian's parents what had happened. Mr. and Mrs. Kanda, with one of their sons and Miss Adams, then drove back to the gravel pit, where they found appellant. Upon the Kanda boy starting to leave the car, appellant warned him not to do so, whereupon the party drove to a nearby gas station and called a physician and the sheriff by telephone. Shortly

thereafter, appellant's parents reached the gravel pit, whereupon appellant entered their car and was by them driven to the police station at Olympia, where he was later taken into custody by the sheriff.

Appellant complains of a question propounded to several of the prospective jurors first examined upon their *voir dire*. Appellant strenuously objected to this question, and, after nine or ten prospective jurors had answered it, the court reversed its ruling and refused to allow the question on the preliminary examination. Immediately after the court announced the reversal of its prior ruling, appellant's counsel moved for a mistrial, which motion was denied. The court then cautioned the prospective jurors that, if any of them should be retained as jurors in the case, the question and answer should be eliminated from their consideration. In its final instructions, the court also told the jury that the question was improper and should not be by them considered. Assuming, for the purpose of argument, that if the court erred in overruling appellant's objection to the question the error could not be cured by the court's instructions, we shall consider the question to which objection was urged upon its merits.

The question to which appellant objected was propounded generally in the following form:

"Are you conscious of any feeling of sympathy arising because of the youth of this defendant that would prevent you from inflicting the death penalty, if, in all other respects, you thought it was merited?"

Appellant argues that this question has no relation to the mental attitude of the prospective juror in regard to the general verdict to be returned; and that, while so far as the general verdict is concerned appellant's youth should not be considered by the jury, this was a matter proper to be considered in connection with the special verdict to be returned fixing the pen-

alty to be inflicted in case the general verdict should be guilty. Appellant further argues that a negative answer to the question imported a promise that, in determining whether or not the death penalty should be. inflicted, no consideration would be given to the youth of appellant. It appears that each person to whom the question was propounded answered the same in the negative, and that four of these persons finally sat as jurors in the case. As appellant exhausted his peremptory challenges, he was compelled to accept as jurors the four persons above referred to, no ground for challenge for cause having appeared.

It is true, as argued by appellant, that, in cases in which the accused is being tried for his life, the greatest care should be exercised to see that persons selected as jurors are open-minded on all points upon which they will be required to pass, including both the general verdict and the special verdict which, in certain cases, as in this, will follow a general verdict of guilty. It is settled law that prospective jurors may be asked whether or not they entertain any conscientious scruples or prejudice against the infliction of the death penalty, and it is elementary that persons accepted as jurors should enter upon the trial free from prejudice for or against the accused, and with minds open and impartial. In controlling *voir dire* examinations, the trial court must be allowed considerable latitude and the exercise of a sound discretion in determining questions which may be asked.

Careful consideration convinces us that the question to which appellant objected is not obnoxious to the criticism levied against the same. The question refers only to the state of mind of the questionee at the time. Appellant was not entitled to be tried by jurors who at the outset entertained a feeling of sympathy for him because of his youth, which would prevent them from

returning any general verdict for which the evidence might call, or which would influence them in exercising their lawful prerogative and doing their duty in returning such special verdict fixing the punishment to be inflicted as they thought proper.

Appellant, of course, had the right to ask on the *voir dire* such questions as would enable him to determine from the answers thereto whether or not the state of mind of the prospective juror was such as would qualify him to act, free from a challenge for cause, or render the interposition of a peremptory challenge advisable. The right of an accused to carefully examine prospective jurors on their *voire dire* will always be enforced to an extent necessary to grant him every reasonable protection. It is not here contended that appellant was anywise limited in the exercise of this right.

We are in entire accord with the authorities cited by appellant to the effect that the determination of the penalty to be inflicted has been by the statutes of this state committed to the judgment and consciences of the jury. *Winston v. United States,* 172 U. S. 303, 19 S. Ct. 212. In returning its special verdict, the jury, under the instructions of the court, may consider any fact or facts deemed by them proper to be considered. A negative answer to the question to which appellants objected, however, imported no more than that the person interrogated was at that time free from any feeling of sympathy for the accused, aroused because of his age, which would at some later period of the trial prevent the juror from acting impartially and with an open mind in exercising his functions under the law in determining upon the special verdict to be returned.

The question might well have been framed in more general terms, and we do not think that the asking of this particular question is to be commended; but a

close analysis of the question itself, bearing in mind the right of appellant to carefully examine the prospective juror as to his state of mind, convinces us that it cannot be held that the fact that the trial court overruled appellant's objections to the question can be held to constitute reversible error.

Appellant next complains of the overruling of his objections to questions propounded by the state to its witnesses John and George Weatherill. These two young men were with appellant in Tacoma on the evening he attended the boxing matches, and with appellant had several drinks after the boxing was over. While John Weatherill was on the stand, counsel for the state asked him whether or not, at the time and place above referred to, he had any conversation with appellant "relative to some act which he was proposing to do some time in the future." To this and one or two other preliminary questions, appellant interposed an objection, which was by the trial court overruled. The witness then answered: "He said not to be surprised if he did something desperate, killed somebody or something." George Weatherill, while on the stand, gave similar testimony.

Appellant argues that, on a trial for first degree murder, testimony tending to prove premeditation should be clear and definite, and that the statements which the witnesses testified appellant made had no tendency whatsoever to prove that appellant at that time premeditated the killing of Lillian Kanda. Appellant, having testified that he remembered nothing after having drunk the liquor shortly after the conclusion of the boxing matches, did not testify that he had or had not made the statements attributed to him. On cross-examination, the Weatherills testified that the statements made by appellant were not apropos to any subject of conversation between the young men,

but were made irrelevantly and were not taken seriously by those who had heard them.

While it is true that it might well be argued that the statements attributed to appellant were not material in the highest degree, the weight of the testimony was for the jury; and the statements having been so soon followed by the killing of Miss Kanda, it cannot be held that the testimony was incompetent or immaterial, and the trial court did not err in overruling appellant's objection thereto and allowing the jury to consider the testimony for what it might be deemed to be worth. One contemplating a murder seldom announces in advance his intention to at some future time kill a certain person, and such a general statement as the Weatherills testified appellant made, followed so soon thereafter by a killing, constituted competent and material evidence upon the question of premeditation.

■ Appellant also contends that the trial court erred in overruling his objection to the admission in evidence of a photograph of Lillian Kanda, his objection to the admission in evidence of this photograph being upon the ground that the photograph was immaterial and should not be received. Appellant argues that the photograph could have no purpose other than to arouse the sympathy of the jury for the family of the deceased and to prejudice them against appellant.

The admission of such a photograph cannot be held error. It is inconceivable that any prejudice to appellant resulted therefrom. Certainly, it could not, to appellant's prejudice, add to the sympathy which would naturally be felt for Lillian's parents. The surgeon who performed the post mortem on the girl's body and testified as to the cause of her death testified that the photograph represented the woman whose body he examined. The photograph was competent

evidence for this purpose. This assignment of error is without merit.

■ One A. R. Faust, called as a witness on behalf of the state, testified that he saw appellant at the dance which appellant attended on the Saturday night preceding the tragedy. During the direct examination of the witness, counsel for the prosecution asked the question, "Did he appear to be sober?" Appellant's objection to the question having been overruled, the witness answered: "Yes, he did.". Appellant argues that, this testimony having been introduced as part of the state's case in chief before any evidence had been introduced by the defense bearing on appellant's mental condition, the question was improper, and that his objection thereto should have been sustained. Appellant seems to argue that the question injected into the case, to his prejudice, the possibility that he was a drinking man.

We find no error in the ruling of the court. The witness saw appellant shortly before the homicide occurred. The question may not have been very material, but the question and answer could not possibly have resulted in prejudice to appellant.

■ A former deputy sheriff, George Erickson, called as a witness for the state, testified concerning conversations with appellant. On cross-examination, appellant's counsel asked the witness if he had told counsel about these conversations when counsel had questioned the witness as to what he knew about the case, to which question the witness answered that he did not remember having discussed the case with appellant's counsel. The prosecuting attorney, on redirect examination, was permitted to ask the witness whether or not the witness, when a deputy sheriff, was in the habit of disclosing to a defendant's counsel all matters pertaining to a case awaiting trial, the wit-

ness answering "No, sir." Appellant objected to this question upon the ground that the practice of the witness in other cases was immaterial, and assigns error upon the overruling of his objection.

In view of the question propounded to the witness by appellant's counsel on cross-examination, the question to which appellant objected was proper. The jury were entitled to be fully advised on the whole situation. The matter concerned rather a controversy between appellant's counsel and the witness than the facts of the state's case against appellant, and we find no merit in appellant's assignment of error in connection therewith.

Appellant's next assignments of error concern the testimony of one Lloyd E. Mabon, who was called as a witness on behalf of the state. This witness, having been charged with the crime of forgery, was confined in the Thurston county jail between November 15, 1934, and December 13 following, on which date he was taken to the state penitentiary at Walla Walla, pursuant to a judgment that he was guilty of the crime of forgery and sentence pursuant thereto, he having pleaded guilty to the charge. Appellant having entered the Thurston county jail November 26, he and Mabon were together confined therein for something over two weeks.

Mabon was brought from the penitentiary to testify at appellant's trial, and there stated that he was considered a trusty at the time appellant first entered the jail, that he was requested to observe appellant, and that he did so and made notes concerning appellant and statements made by him. He further testified that, before being taken to the penitentiary, he had turned these notes over to the officers of the law. It further appeared that the sheriff and prosecuting attorney of Thurston county had interviewed Mabon

158

during the latter's confinement in the penitentiary and shortly before appellant's trial.

Mabon testified that appellant had told him that if he could not have the affections of Lillian Kanda no one else would, and that he had planned that no one else would get her, giving special consideration to such plan on and after the Wednesday prior to the homicide. This testimony was, of course, a most important part of the state's case, as some of the statements which Mabon testified appellant had made referred to the latter's acts during the period of time concerning which appellant claimed that he had no recollection of what he had done.

It appeared that Mabon had been a prominent citizen of Thurston county, serving as justice of the peace in his community and a councilman of the town of Tumwater. He was, of course, well acquainted with the prosecuting attorney and other county officials. Appellant's counsel, on cross-examination, asked Mabon if, at the time he pleaded guilty to the charge of forgery in the first degree, he was not also guilty of many other offenses by way of misappropriation of money, both in his capacity as justice of the peace and as a member of the council of his town. Counsel for the state objected to this question, whereupon appellant's counsel made a statement as follows:

"I expect, if the witness is permitted to ask this question, I expect it to be answered in the affirmative. I expect to follow it up by showing that no charges of any other kind have been filed against him based upon these admitted crimes, also to show that the prosecuting attorney's office knows of these crimes and knows of the existence of the evidence upon which a conviction could be had; that he has been promised immunity, that the witness has been promised immunity from prosecution for those offenses and that the giving of evidence in this case was at least one of the inducements offered him and resulting in the failure of

the prosecuting attorney's office to file additional charges against him.''

After argument, the trial court sustained the objection to the question, at the same time informing appellant's counsel that it was not the purpose of the court to prevent him from going into the question of any promises or inducements that may have been made to Mabon.

Appellant argues that, in sustaining the objection to his question above referred to, the trial court committed reversible error. It was frankly conceded that the witness was, at the time of the trial, serving time in the penitentiary. Appellant's counsel inquired of the witness at some length as to whether or not the officers of the law had made him any promises of immunity as to any other offenses of which Mabon might have been guilty. The witness denied that any such promises had been made.

It cannot be held that counsel's statement that he expected the witness to admit that he had been guilty of many other offenses, adds anything to the situation as presented by the bald question. The witness stood before the jury, an admitted convict under sentence, then serving his sentence in the state penitentiary. To require the witness to answer the question might have opened up an indefinite field of collateral inquiry entirely irrelevant to the question before the jury, and tending only to confuse the issues which the jury were to determine. Appellant was accorded full right to cross-examine the witness as to any promises made or inducements held out to him (the trial court twice referring to this matter), but to allow a question concerning other possible offenses which might have been committed by the witness would have gone farther afield than the trial court was under any obligation to go.

160

In this connection, appellant cites the case of *State v. Cerenzia,* 134 Wash. 500, 236 Pac. 80. In the case cited, it appeared that five persons were jointly charged with robbery. Four pleaded guilty, and one stood his trial, with the result that he also was found guilty. On appeal, he contended that the trial court had improperly limited his cross-examination of one Olive Hill, who had stated that she was well acquainted with appellant and the other defendants. Her testimony tended to show that appellant, as well as the defendants who had pleaded guilty, jointly committed the crime with which they were charged. It appeared that, after the defendants were arrested, the witness was also confined in jail, it then appearing possible that she might be jointly charged as accessory to the robbery or proceeded against for some other offense. She was not, however, so charged. At appellant's trial, on cross-examination, she was asked: "Has there been any promise made to you by the prosecuting attorney's office, Miss Hill, with reference to leniency in your matter in the event you testify against Jimmie here?" (the appellant being indicated). The court sustained an objection to this question, which on appeal this court held was error.

The circumstances are, however, very different from those here present. The witness was held in jail in connection with the identical offense for which the defendant was then standing trial. She was a friend and associate of the persons charged. Any promise made to her might have directly concerned the offense for which the appellant was then being tried. She should have been required to answer, touching promises made to her, if any, as an inducement to testify against the defendant. The witness Mabon was interrogated as to whether or not, any promises had been made, or inducements held out, to him, and answered

that none had been made. The case cited does not support appellant's contention that the court improperly sustained the state's objection to the question asked. In connection with appellant's offer of proof, the trial court clearly stated that there was available to appellant an opportunity to make any proper inquiry as to inducements held out to Mabon. The record is free from error in connection with the matters last discussed.

Appellant next assigns error upon the ruling of the trial court sustaining the state's objection to the following question propounded to Mabon on cross-examination:

"If you had made full disclosure to the sheriff and the prosecuting attorney before you went to Walla Walla with reference to what you had observed concerning Merritt Hunter, why did they have to go to Walla Walla to interrogate you?"

Mabon stated that the sheriff and prosecuting attorney visited him in Walla Walla. The question to which an objection was sustained was purely argumentative, the facts were before the jury, and the objection was properly sustained.

Appellant next complains of the overruling of his objection to questions propounded by the state to appellant's witness Clifford Morrow, on cross-examination. The witness had stated that appellant had been bothered by the objections of his parents to his association with Miss Kanda, and had testified that appellant, not long before the homicide, had apparently worried more over the situation than he had previously. On cross-examination, counsel for the state asked the witness whether or not he had observed any change in appellant's habits during the six months period next preceding November, 1934. Appellant objected to this question, his objection having been over-

ruled. His objection was also overruled to a question as to whether or not, in the opinion of the witness, appellant was rational in his conversations during the period mentioned. Appellant argues that these questions were improper as not germane to the examination in chief.

We cannot agree with this contention. The witness had stated that appellant was bothered and worried by the situation, and that he was taking it harder than he had during the previous months. It cannot be held that the questions complained of went so far beyond the scope of the direct examination as to constitute error.

Appellant called as a witness on his behalf one Eldon Brown and interrogated him concerning a fall which appellant had suffered while working in the woods, and asked the witness whether or not, in falling, appellant had struck the iron portion of an appliance or the wooden frame thereof, to which the witness answered: "Well, I couldn't swear to it." In response to the question, "What is your best judgment on it," the witness answered: "I think he hit the wood." Counsel for the state then interjected the remark, "Well, if he doesn't know he can't testify," which remark, after some colloquy, the trial court treated as an objection to the testimony and sustained. The answer to the question is in the record and apparently was not stricken. In any event, the matter is entirely immaterial, as the "best judgment" of the witness, under the circumstances disclosed by the record, would not be material.

Another assignment of error is based upon the testimony of Mr. Brown, but the assignment is entirely without merit.

Appellant next complains of questions propounded to himself on cross-examination, objections to

which were overruled. Appellant was asked: "And you traveled around with women to some extent, did you not, for recreation?" Appellant argues that this question was asked in an endeavor to suggest to the jury that appellant had associated with persons of immoral character. No such insinuation is warranted, and the question was properly allowed.

Appellant next complains of a question asked him, which, upon objection, was withdrawn. In this incident there is no error available to appellant.

Counsel for the state also asked appellant on cross-examination: "But you have denied telling Mr. Mabon in this matter of planning the death of Lillian Kanda. Did you hear Mr. Mabon's testimony as to when that occurred?" It is contended that this question was argumentative and therefore objectionable, which contention is not well founded. Counsel for the state later directed appellant's attention to the time when appellant claimed he recovered his memory and asked appellant whether or not he had made any inquiries in regard to "what happened out there and how the Kanda family felt about it." The first part of the inquiry was clearly proper. It cannot be held that the latter portion was improper. Appellant's story concerning the temporary loss of his memory was peculiar and unusual, and the right of the state to cross-examine appellant on this matter was properly allowed to take a wide range.

Appellant was also asked: "Well now, Mr. Hunter, will you be honest enough to tell me what you did it for?" Appellant argues that this question was improper as assuming that prior answers made by the witness had not been truthful. It cannot be contended that counsel for the prosecution were of the opinion that appellant in his testimony had been at all times telling the truth. In a long and bitterly contested trial,

counsel cannot be held to a precise and invariable choice of the best words to express his ideas. Appellant's counsel simply objected to the form of the question without more particular criticism thereof. It is impossible to believe that the question resulted in any prejudice to appellant's rights. We find no error in this matter of which appellant can complain.

 Doctor David Livingstone testified as an expert witness on appellant's behalf, he having examined appellant as early as Monday, November 26. He stated that, on the date mentioned, appellant was not oriented as to time or place, was not worried over his situation, and stated that his father would soon come and take him home. The witness testified that he next saw appellant December 4, on which occasion appellant's demeanor had changed, that he understood the elements of time and place and answered all questions intelligently. The witness interviewed appellant on two subsequent occasions, one the day after the trial started, and again later during the course of the trial. In his testimony, the doctor stated that, during his last interview with appellant, he questioned appellant about certain of the testimony which had been given at the trial. Counsel for the state objected, arguing that it was contended that, during the trial, appellant was perfectly sane, and that the matter was therefore immaterial.

Counsel fails to call our attention to any reason why conversations between the doctor and appellant during the trial would be material. Appellant was admittedly at that time mentally responsible, and we fail to see how appellant's statements concerning testimony which had been introduced would assist the jury in determining appellant's mental condition at the time of the homicide.

 In cross-examining Doctor Livingstone, counsel for the prosecution was allowed to ask hypothetical

questions, based, as appellant contends, on "one item of testimony, rather than on all testimony introduced concerning appellant's mental condition." We find no error in any of these matters. An expert witness is naturally subject to a searching cross-examination, and the bounds of legitimate examination were nowise exceeded.

■ George Erickson, a deputy sheriff called as a witness for the state, testified as to information given him by appellant when the latter was booked at the county jail. Appellant contends that the records constituted the best evidence, and that the witness should not have been allowed to testify orally on these matters.

It does not appear that counsel for appellant was denied access to these records, or that any request that the records be produced in court was denied. The witness simply narrated the conversation between himself and appellant, which had some bearing on appellant's mental state, and no prejudicial error was committed in connection with this matter.

■ Appellant complains of the refusal of the trial court to give an instruction which he requested, to the effect that the intentional killing of one human being by another does not constitute murder in the first degree, if the killing was committed under the influence of sudden intense anger produced by an adequate or reasonable provocation, the instruction proceeding to explain other elements concerning temporary excitement and the nature of the provocation which must have existed. Appellant's counsel argues that, if Miss Kanda had not started running toward the highway, appellant would not have shot her.

This may be true, but at the same time the girl's act in fleeing from the car can under no possible theory be held to justify such an instruction as appellant re-

quested. The record contains nothing which could, even by the wildest flight of imagination, be considered as provocation. The instruction requested was not justified by the evidence, and was properly refused.

Appellant next complains of two instructions given by the trial court, one concerning circumstantial evidence and the other relating to the expert testimony in the record concerning appellant's mental condition and some other matters hereinafter referred to. As to the first instruction, appellant simply argues that circumstantial evidence was not relied upon to prove any issue in the case, and that, therefore, the instruction should not have been given.

It is not contended that the instruction as given misstated the law. It cannot be held that there was no evidence of a circumstantial nature which the jury might have considered. If appellant's contention that the record contains none is correct, then the instruction was harmless error, but we are satisfied that the record contains evidence properly classified as circumstantial, and that the instruction was properly given.

Appellant complains of that portion of the second instruction which told the jury that they should, in determining appellant's mental responsibility or irresponsibility, consider, in addition to the testimony of the experts, all of the other testimony produced on the subject and concerning the defendant's conduct, demeanor and appearance in court, and that they should base their verdict upon the evidence as a whole. Appellant, of course, by a special plea and the evidence which he introduced thereunder, contended that, at the time of the trial, he was perfectly sane; and he argues that he was prejudiced by the instruction, which informed the jury that they could take into consideration his demeanor during the trial.

Appellant testified as a witness on his own behalf,

and his testimony and everything connected therewith, including his manner and demeanor on the stand, became a part of the evidence in the case. It cannot be held that the instruction complained of resulted in any prejudice to appellant. In so far as the jury were told that they should consider, in connection with the testimony of the experts, all the other testimony in the case, the instruction was entirely correct.

 Appellant complains of the form of verdict received, which reads as follows:

"We, the jury duly empanelled and sworn to try the above entitled cause, do find the defendant guilty of murder in the first degree and we further find that the death penalty shall................be inflicted."

This form of verdict was prepared by the court and, in our opinion, is not incorrect in form. In the discretion of the court, the jury might have been called upon to return two separate verdicts, but the form adopted here could not have been misunderstood, and the court did not err in receiving the same as the verdict of the jury.

 In support of his motion for a new trial, appellant assigned most of the errors hereinabove discussed, and in addition contended that he was entitled to a new trial because of misconduct of the jury, and also because of newly discovered evidence. It seems that, on Saturday, February 16, during the trial, one of the jurors was, by mistake, left behind when the other members of the jury, in custody of the bailiff, left the court house for luncheon.

It appears without contradiction that the juror was away from the panel only a few moments, and it is not contended that during this period he talked with any person. Appellant attempts to distinguish the cases of *State v. Powers,* 152 Wash. 155, 277 Pac. 377, and *State v. Johnson,* 122 Wash. 394, 210 Pac. 774, by

arguing that a different rule should prevail in a murder trial. We cannot follow this argument. Under the cases cited, and the later cases of *State v. Stratton*, 172 Wash. 378, 20 P. (2d) 596, and *State v. Navone*, 180 Wash. 121, 39 P. (2d) 384, the incident referred to does not call for the granting of a new trial.

As to newly discovered evidence, appellant contends that affidavits which he filed in support of his motion show that the witness Lloyd E. Mabon testified falsely when he stated that he had been offered no inducement whatsoever for testifying as a witness for the state. The matters referred to arose subsequent to the time Mabon testified before the superior court, and we fail to find in the showing made by appellant anything which would have justified the trial court in granting the new trial demanded by appellant.

We have carefully considered and referred to in this opinion all of the errors assigned by appellant. We are thoroughly convinced that appellant in all respects had a fair trial, and that the record before us is free from error. The judgment appealed from is accordingly affirmed.

MILLARD, C. J., TOLMAN, GERAGHTY, and MAIN, JJ., concur.