[No. 38888.    En Banc.    October 5, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. DEAN ALLEN
BROMLEY, *Appellant*.*

*Reported in 432 P.2d 568.

*Robert R. Briggs,* for appellant (appointed counsel for appeal).

*John G. McCutcheon, Schuyler J. Witt, Everett Plumb,* and *Joseph D. Mladinov,* for respondent.

HILL, J.—This appeal arises out of a crime which was widely publicized in the Pacific Northwest—the kidnapping of Charles Hyde, III, near Tacoma, Washington. A ransom of $45,000 was paid, the lad returned to his home unharmed.

The participants in the kidnapping either surrendered voluntarily or were speedily apprehended—the appellant, Dean Allen Bromley, in Arkansas.

The three were tried together. Tilford G. Baker, who forced the boy into the "kidnap" car, and the appellant Bromley, who drove the car, were both found guilty of kidnapping in the first degree. The jury, however, did not impose the death penalty. The third defendant, James Edward Evans, who did not participate in the actual "taking" of the boy, was found guilty of conspiracy to kidnap.

Neither Baker nor Evans appealed his conviction; however, Bromley has appealed making 9 assignments of error.

A majority of the court agrees that there was such an accumulation of matters of dubious propriety that a fair trial was denied the appellant Bromley and that he must be granted a new trial, despite the fact that he concededly drove the "kidnap" car, accepted part of the ransom money, and fled to Arkansas with his wife and child.

We will consider the accumulated items separately. With one exception all members of the court are agreed that it was prejudicial error to permit Dr. Harlan McNutt to testify in rebuttal that, in his opinion, Bromley was not a person who could be easily coerced.

To fully understand the importance of this testimony, it must be understood that the actual participation of the

defendants Baker and Bromley in the physical act of kidnapping was not denied. Each of the three defendants entered a plea of insanity, but Bromley withdrew his plea during the trial. Bromley (and Evans) claimed coercion by Baker who, Bromley testified, had threatened to kill him and his wife unless he cooperated in the kidnapping. This, in the final analysis, was his only defense.

Bromley, by reason of his original plea of insanity, had been required to submit to an examination by Dr. McNutt, the state's psychiatrist.

It is conceded that the state could not have used Dr. McNutt's testimony against Bromley, in its case in chief, but it was admitted to meet his defense of coercion.[1] The defense contends that it was devastating, but urges that it was not admissible.

■ It smacks of compelling a defendant to furnish testimony against himself, and of proving a trait of character by the opinion of an expert instead of by the proof of

---

[1] Dr. McNutt testified in part as follows:

"Q. Well, describe his personality for me as you see it, Doctor?

"A. Mr. Bromley is, as I say, a young man, I will try to be as concise as possible, and not historical. I think that he is emotionally quite unstable. I would think that he is easily aroused by any offense directed towards him.

"I think that he could, and would give a good account of himself if he was irritated.

"I might say this is my personal observation from talking with him, not taking anyone else's word.

"He showed emotional response of a very remarkable kind when I was talking with him.

"This is essentially his personality, I am not offering it as a diagnosis. You asked about his personality.

". . . .

"Q. Could you tell me whether or not in your opinion this defendant, Bromley, is dangerous?

"A. Yes, sir, he could be dangerous.

"Q. Now, with this type of personality that you describe as to Bromley, would you say, could you tell me whether or not he could be easily coerced into committing a crime against his will?

"Mr. Briggs: To which I will have the same objection, Your Honor.

"The Court: Objection will be overruled.

"A. I think Dean would be rather difficult to coerce."

reputation in the community. Bromley having been required to submit to an examination by the psychiatrist to enable the state to meet the defense of insanity, and that defense having been withdrawn, the state should not have been permitted to make any further use of the testimony of the psychiatrist against the appellant.

■ As we said in *State v. O'Brien,* 66 Wash. 219, 223, 119 Pac. 609 (1911),

> It has ever been the law that one who offers himself as a witness is bound to disclose his motive and disposition. But the rule which allows this inquiry on cross-examination is not inconsistent with, but is in harmony with the rule that, if others speak of the general character of a person, it must be by way of reputation. To hold otherwise would be to substitute the judgment of a witness for that of the jury.

Certainly, the effort by the state here was to substitute the judgment of Dr. McNutt for that of the jury on the issue of whether Bromley was coerced.

In the language of the caption of an article in 102 U. Pa. L. Rev. 980 (1954), by Judson F. Falknor and David T. Steffen,[2] the state would take the determination of the appellant's susceptibility to coercion "from the 'Crucible of the Community' to the 'Couch of the Psychiatrist'."

The general rule is well stated by Mr. Justice Jackson in *Michelson v. United States,* 335 U.S. 469, 93 L. Ed. 168, 69 Sup. Ct. 213 (1948):

> The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits; nor can he testify that his own acquaintance, observation, and knowledge of defendant leads to his own independent opinion that defendant possesses a good general or spe-

---

[2]The authors, the former well known in this state as legislator and Dean of the University of Washington Law School and an outstanding authority on Evidence, express considerable concern over the opinion in *People v. Jones,* 42 Cal. 2d 219, 266 P.2d 38 (1954), wherein a trial court was reversed for not permitting the defendant in a sex-deviation case to call a psychiatrist who would testify that, as a result of examinations, he reached the conclusion that the defendant was not a sex deviate.

cific character, inconsistent with commission of acts charged. The witness is, however, allowed to summarize what he has heard in the community, although much of it may have been said by persons less qualified to judge than himself. The evidence which the law permits is not as to the personality of defendant but only as to the shadow his daily life has cast in his neighborhood. (p. 477)

Except where the defense is insanity, or in sexual deviation cases, the instances in which psychiatrists have been permitted to testify to the likelihood of a defendant's specific trait of personality or character have always been, in the first instance at least, on behalf of the defendant. Thereafter it may well become a battle of the psychiatrists.

We find no authority to support the trial court's permitting the state to inaugurate the battle.[3] As a matter of interest, the only case involving the offer of expert testimony as to the likelihood of a defendant having been coerced, which we have been able to find, is *People v. Villegas*, 29 Cal. App. 2d 658, 85 P.2d 480 (1938). In that case, the defendant called a psychologist and offered to prove by her that she had known him for 14 years,

. . . and that by reason of her study of psychology she was in a position to testify that appellant's will power was weak, that his physical condition was bad, and that he therefore was without sufficient force to "resist the impulse of this other boy to take him out on these robberies". (p. 663)

The trial court sustained an objection to the proferred testimony. The court of appeals affirmed, saying:

It was both incompetent and immaterial, and she was entitled only to testify, as she was permitted under the court's ruling to do, concerning the general reputation of appellant in the community in which he lived for the traits involved in the offenses charged. (p. 663)

A majority of the court are also of the view that the trial court erred in instructing the jury that when a defendant claims coercion or duress as a defense, he must prove it by the greater weight of the evidence.

[3]Views contra are expressed in "Expert Psychiatric Evidence of Personality Traits," 103 U. Pa. L. Rev. 999 (1955).

■ It is believed that such defense need only be established to the extent of creating a reasonable doubt in the minds of the jurors as to the guilt of the one accused of the crime charged. *State v. Pistona,* 127 Wash. 171, 219 Pac. 859 (1923) (alibi); *State v. Rosi,* 120 Wash. 514, 208 Pac. 15 (1922) (alibi). In the *Rosi* case, *supra,* we said:

> As to all such affirmative defenses we have always held that the burden is upon the accused to support his defense to the extent of establishing a reasonable doubt in the minds of the jurors as to the guilt of the accused of the crime charged. (p. 518)

It is interesting that the United States Court of Appeals, Ninth Circuit (in *Thomas v. United States,* 213 F.2d 30 (9th Cir. 1954)), says that by the stated law in six circuits even our *Rosi* case, *supra,* places too much of a burden on a defendant.

The state cites no case to support its position, save *State v. Collins,* 50 Wn.2d 740, 314 P.2d 660 (1957), where we said that the burden was on the defense to estabish the defense of insanity by a preponderance of the evidence. Such a case starts with a presumption of sanity which the defense must overcome, and it is not at all comparable to such defenses as alibi, self defense, entrapment, and duress.

■ The appellant rightfully claims that there were portions of Baker's confession which served no purpose except to inform the jury of the criminal record of the appellant. The usual instructions were given that Baker's confession could not be considered as evidence against a codefendant who was not present when it was made. However, it would appear that there were portions of the confession admitted which served no purpose save to suggest that the appellant Bromley had been involved in other crimes. We quote from the confession:

> Q. Mr. Baker is it true that you had been shown a picture that you positively identified as being the same person as the Dean [the appellant] that you referred to in this statement of yours?
> A. Yes.

The questioner then had the identification that he desired, but he didn't stop there.

> Q. Mr. Baker is it also true that the picture that you identified as being the Dean [the appellant] that you referred to in your statement, has on the face of the same picture an identifying Pierce County Sheriff #18403?
>
> A. Yes.

This last question had no purpose of further identification; its sole object was to prejudice Bromley by reference to a county-sheriff number on his photograph, implying some prior crime. The harpoon had now been placed and sharpened; it pierced the victim (Bromley) when it went into evidence as part of the confession. Bromley's counsel objected, but to no avail.

In *State v. Goebel,* 36 Wn.2d 367, 218 P.2d 300 (1950), we refer to the minute peg of relevancy being obscured by the dirty linen hung upon it. Here the minute peg of relevancy, as part of Baker's confession, is obscured by the picture hung upon it, which picture just happens to bear "Pierce County Sheriff #18403."

We do not need to discuss whether or not this was prejudicial error in this case, as on appellant's new trial Baker will not be a party and his confession will not be admissible.[4] *State v. Nelson,* 65 Wn.2d 189, 396 P.2d 540 (1964).

In any event, it did nothing to enhance the appellant Bromley's chances for a fair trial; and neither did the reference to the Lindbergh, Mattson and Weyerhaeuser kidnappings in the prosecution's arguments to the jury, of which the trial judge said: "I think it's too bad it was said."

We do not agree with appellant's contention that Bromley was entitled to be included with Evans in the conspiracy-to-kidnap instruction. Unless Bromley sustained his defense of coercion, he was guilty of kidnapping.

Only one other assignment of error merits discussion.

---

[4] Baker could, of course, be a witness; but the confession could be used then only for the purpose of impeachment.

Counsel for Bromley, the only one of the defendants who had a prior criminal record, desired to try the "technique"[5] of first advising each juror that Bromley had previously been convicted of a crime or crimes, and then to inquire as to whether this fact would prejudice the juror in his determination of Bromley's guilt or innocence in the present case. After the second juror had been examined in pursuance of this technique, the trial court sustained objections to its further pursuit.

It is urged that this was error and deprived counsel for Bromley of information which could have led to a more intelligent and effective use of the peremptory challenges available to him.

■ No case authority is cited for the privilege claimed by Bromley. Indeed, the case authority is contra in regard to a somewhat similar technique. We have an 1896 decision (*State v. Everitt,* 14 Wash. 574, 45 Pac. 150), in which the defendant attempted to ascertain on the voir dire of the jurors whether the fact that he was charged with cattle stealing would prejudice them against him as a witness. We held that objections to the inquiry were properly sustained, saying:

> Again, as to the other phase of the question, when the defendant enters a witness stand he enters it under the same rules and on the same footing as any other witness, and he has no right to attempt to ascertain in advance what the jury may think of his credibility as a witness. All questions of this character would simply have a tendency to confuse and entrap jurors and render the selection of a legal juror almost impossible. (p. 576)

The trial court advised counsel, in this case, that in the event Bromley became a witness the jury would be instructed as to the effect and purpose of the admissibility of evidence of prior convictions. The jury was so instructed, and there were no exceptions to the instruction.

The trial court must be allowed considerable latitude in the exercise of a sound discretion in determining questions

---

[5]Rothblatt "Successful Techniques in the Trial of Criminal Cases." (1961)

which may be asked on voir dire. *State v. Hunter,* 183 Wash. 143, 48 P.2d 262 (1935).

There was no abuse of that discretion in this case.

For reasons heretofore indicated, appellant Dean Allen Bromley was not accorded a fair trial, and the judgment and sentence appealed from is set aside and the cause is remanded to the Superior Court for Pierce County for a new trial.

DONWORTH, WEAVER, ROSELLINI, HUNTER, and HAMILTON, JJ., and DENNEY, J. Pro Tem., concur.

HALE, J. (dissenting)—I dissent. The majority decision grants a new trial for trifling reasons. Finding only a mole-hill of error in a mountain of evidence, the majority, I think, ignores an oft-stated precept that one accused of crime is entitled to a fair, not a perfect trial. The defendant made a full, detailed and highly corroborated confession in open court under oath, seeking to avoid the legal consequences of his testimony only through a claim of coercion and duress. The few words of testimony by a psychiatrist that the defendant was not likely to be susceptible to coercion seems to me a harmless error and, when placed alongside the defendant's step-by-step description of his participation in the kidnapping, of trifling legal significance. To warrant a new trial, error must be prejudicial. *State v. Wilson,* 38 Wn.2d 593, 231 P.2d 288 (1951), *cert. denied,* 342 U.S. 855, 96 L. Ed. 644, 72 Sup. Ct. 81 (1951); *State v. Meyer,* 37 Wn.2d 759, 226 P.2d 204 (1951); *State v. Moore,* 35 Wn.2d 106, 211 P.2d 172 (1949); *State v. Gaines,* 144 Wash. 446, 258 Pac. 508 (1927), *cert. denied,* 277 U.S. 81, 72 L. Ed. 793, 48 Sup. Ct. 468 (1928).

One who acknowledges that he knowingly, intentionally, and purposely committed all of the acts constituting a crime has confessed to that crime. 2 Wharton, Criminal Evidence § 336 (12th ed. 1955). Bromley gave such a confession; he showed, too, that the defense of duress and coercion was not in law available to him.

Called by his own counsel to the witness stand on direct examination, Dean Allen Bromley testified to full complicity in the planning and execution of the kidnapping, including his receipt of more than $5,500 in ransom and his flight to Arkansas with the money. All of the following narrative, with one minor exception, comes exclusively from Bromley's direct examination, and every detail of his testimony was corroborated by a wealth of other cogent evidence.

Bromley testified that he was 20 years old, married, had one child, and had been convicted of a felony in Washington, burglary in Kansas and loitering (a misdemeanor) in justice court in Tacoma. He and his father, he said, operated a gas station in Tacoma where codefendant Jim Evans traded. He first met Evans during the summer of 1965, and the two became friends through working together on their automobiles.

He described first discussing the kidnapping with Evans, testifying that one day Evans and his wife and Bromley and his wife were at the grocery store, and

this had been brought up there while we was there about the kidnapping, and he [Evans] asked me something about "Well, this guy wants some help or something," and I said, well, I said, "Jim," I said, "I can't do it." I said, "I wouldn't have any part of it." He said, "Well, he needs somebody to drive the car." I said, "Well, I am sorry," I says, "I couldn't because if I get picked up one more time, I would do some flat time. I just can't see it."

He testified that, after this initial conversation with Evans about the kidnapping, he first met Tilford Baker at the "Jolly Rogers Cafe out on 112th and Vickery Road" about the 7th or 8th of November, 1965. Bromley described the meeting and conversation:

I and Jim Evans went out to the Jolly Rogers Cafe to have a cup of coffee, and we walked in and Mr. Baker was sitting up at the counter drinking coffee, and I and Jim sit down at the table, and we got our coffee and was sitting there talking, and Mr. Baker come over and he sit down besides us. And Jim looked at me a little bit funny, he said, "Dean," he said, "this is the man." And I knew what he was talking about, about this kidnapping. It just

happened the night before that he told me about this, and I kind of laughed, and I said, "Yes, sir, okay." I says, "Okay." We was sitting there, in there and drinking coffee, and the conversation kind of built up to this, and he started talking about it, telling us how it was going to come off, and everything. And I had thought the guy was some kind of a nut, or something, because—I mean, you just don't talk like that, you know. I mean, you know, some kind of a kook. So I listened to it. Then I kind of just got up and laughed it off, and started to walk out.

He explained Baker's first threat in this way:

Then Mr. Baker come over and tapped me on the shoulder, and reached in his pocket and pulled out a small hand gun, and he said, "You know too much." He says, "Come back over and sit down and have coffee," he says, "and act like nothing has happened." And—I mean, at that time, a man with a gun, he is boss, so I listened to him. I went back over and had coffee.

We thus leave Bromley in a claimed state of fear while having coffee; but the fear must have subsided, for later that afternoon Baker drove both Evans and Bromley in his truck over the route proposed to be taken in kidnapping the Hyde boy. After this partial rehearsal of the crime, Bromley, according to his own testimony, went home for the evening meal, separating himself from Baker by several miles. During the period of their planning and rehearsing the kidnapping, he says Baker threatened him three or four times—but the threats occurred over an interval of probably 10 days. Bromley's testimony accordingly reveals that he was out of Baker's presence most of the time during the planning and rehearsal of the criminal scheme, during which interval he had unimpeded access to a telephone, the police station, sheriff's office and the offices of the FBI.

For example, one threat, says Bromley, occurred in the Jolly Rogers Cafe, but after that incident the three met at the Aba-Daba Cafe near Ponder's Corner at 6:30 a.m., synchronized their watches, drove to another place called Brownie's Cafe, and then Bromley took Baker back to the Aba-Daba Cafe, preparatory to carrying out the kidnapping. Thus, the three men were in and out of automobiles

several times on the morning of the scheduled kidnapping in the presence of other persons with several opportunities for Bromley to withdraw from Baker's presence without any risk of immediate harm.

Bromley's testimony showed that he stayed in the criminal conspiracy and actively continued with the planning despite innumerable chances to get away from Baker. Describing from the witness stand the first abortive attempt at the kidnapping, Bromley said that Baker told Evans to go to the Little Park Cafe on Pacific Avenue and that Baker and Bromley then

> got out in the car, and we pulled across the street at the Pizza Haven out at Ponders Corner. And we was getting ready to go through this kidnapping, getting ready to pull off this kidnapping then. And Mr. Baker, I don't know why, but he turned on the radio, and the news was on, and it told the time, and he said, "Oh, Jesus, we are late." He said, "Get going." And I started the car, and we left.
>
> And we got out in front of the Hyde residence, and little Charles Hyde, he was across the street, already across the street, on the highway down into the Country Club.
>
> And Baker said, "Get up there and get turned around." He says, "If anything goes wrong now," he says, "there is some people that is going to lose some heads over this."
>
> So I drove up the road, and I turned around real quick, and we come back. By this time, this little Charles Hyde, he was inside the Country Club. It was too late then. And this (indicating) nut, he was going to go ahead and go through with it. He was going to go ahead and pick up the boy right there with everybody standing around and everything. And he was a real kook of some type. *And no, sir, boy, no part of it for me.* (Italics mine.)

After this unsuccessful effort, Bromley and Baker returned to the Little Park Cafe to let Evans know of their failure; Bromley, in his testimony, fixed the time of the attempt, failure and foregoing conversation at either the 12th, 13th or 14th of the month. He and Evans did not see Baker again for a few days after their first attempt at

kidnapping. Thus, at this point in the plot, Bromley was out of Baker's presence for considerable periods of time and could not possibly claim to be in danger of instant death or grievous injury. Showing innumerable opportunities not only to withdraw from the criminal enterprise, but equal chances to avoid danger of instant death or grievous injury from Baker during the long intervals he was away from Baker in the course of planning and preparing for the kidnapping, Bromley's testimony continues:

Q. Did he then tell you when there would be the next attempt? A. Yes, it was on a Monday, I believe. Saturday or Sunday I didn't talk to him at all. I was busy with my wife moving. Q. Pardon? A. I and my wife was busy on a Saturday and Sunday. We didn't see him then, but the next day, Monday, I believe it was a Monday, yes. He, him and Jim Evans came over to the house Monday evening. We had some company over there, a fellow that I was working with. Him and his wife came over to see us, and Jim, he came up to the door. Baker told him to come up to the door and talk to me, so I, they wanted me to come out and go down to the Jolly Roger and have coffee with them. I had company and everything, and I told them, you know, "No, I couldn't leave right then. My company was there, and everything." And they said, "Well," they said, "meet us there, you know, tomorrow morning," which would be Monday morning. He said, "Meet us there Monday morning." This was Mr. Baker. So I said, "All right." So Monday morning I went out there, and Mr. Baker was there. He was there in the parking lot. He pulled in just before I did. And Mr. Evans was just in. When we pulled in, he was sitting there drinking coffee, and that is when he told us that the kidnapping was on for Wednesday, the 17th. Q. He told you that it was set for the 17th? A. Yes, yes.

He then went on to say that Baker told them the kidnapping was on for the 17th, a Wednesday. Bromley, on leaving that meeting with Baker and Evans, then took his wife with some of her belongings to the home of his wife's mother. He testified that

I seen Mr. Baker the night of the 16th, and he told us, he said for us to be sure and be there at six o'clock on the 17th out at the Abba Dabba Cafe. So I and Jim Evans, we

decided that we was going to talk this nut out of this the next morning. So we go over there the next morning. I seen Jim Evans the next morning. We went to the Abba Dabba Cafe, and— Q. Was Baker there at that time? A. Yes, he was. Q. Where was he, Dean? A. He was in the front seat of the car. Q. Now, was there anything that he had to tell the time with? A. Yes, he had a, he had brought a clock from home to make sure this time the time was right, you know.

Bromley's testimony thus shows that he was away from Baker most of the night preceding and until 6 a.m. of the day of the kidnapping and, therefore, was free from the danger of instant death or grievous bodily injury during that long interval. While under no duress and coercion, as those terms are known to the law, he nevertheless kept the 6 a.m. rendezvous at the Aba-Daba Cafe for the planned purpose of carrying out the kidnapping.

Evans, Baker and Bromley—according to Bromley's testimony—met at the Aba-Daba Cafe, had coffee together and were threatened by Baker while trying to dissuade him from the kidnapping. But he testified too that he had procured some stolen license plates from a neighbor boy, purchasing them for a pack of cigarettes, and from the witness stand admitted putting the stolen plates on the car they were to use in the kidnapping. Other evidence in the trial, not denied by Bromley, proved that he and Evans had earlier driven to Seattle and rented the car to be employed in the kidnapping, thus putting many miles between them and Baker while at the same time carrying out a vital part in the preparations for the crime.

The confession goes on. Bromley testified that, on the morning of the kidnapping, he had dressed in an old work shirt, an old jacket, old boots he had been wearing when working in cement, and corduroy jeans; he put tape across his chin and a strip of tape across his face beneath his nose, and wore wrap-around dark-colored glasses. Baker also had tape across his chin and face. With Bromley at the wheel and Baker in the front seat, they drove toward their planned seizure of young Charles Hyde on the morning of

the 17th. Here are further excerpts from Bromley's testimony, showing the detailed planning and precise execution of the scheme. Bromley, referring to Baker, said:

> He, when we started out, he was in the front seat. And we went across the freeway bridge, I don't know what that is, just a freeway bridge that goes across the freeway, the bridge over Ponders Corner, and then we went down to Gravelly Lake Drive. And we got up to a place there where you could turn around, just a little side road, and he had me stop there and turn around. I turned around, and he got out, and got in the back seat.

And then, describing the actual kidnapping of the boy—bearing in mind that all of this time Bromley is driving the kidnap car and wearing tape on his face and colored glasses—he testified:

> All of a sudden—I was sitting there, no cars was around, and I seen the boy come and get in the back of the car. I just kind of glanced up over my shoulder, and Mr. Baker was helping him into the car. And he just got him into the car, you know, put him in there, and—he didn't actually put him there, he just helped him into the car. And then he drove [sic] me to drive on. He said, "Ride, Clyde," or something like this, and we left. . . . He [Baker] was in the back seat. He was just sitting right next to the boy. He had the boy sit there for a little while to make, so it wouldn't look so suspicious or anything. We rode on across the freeway bridge, and at that time there was some cars pulling over down to the freeway, and he just helped the boy down on the back seat, and down on the floor board to the back of the car. And then he just laid a blanket, some kind of a blanket over his head. And then he got up, he sat up straight, and he put the boy's books over in the front seat with me. And then he just, we got out, started across the reservation, the Army Reservation, and he just crawled over into the seat with me.

Bromley then testified that somewhere in an isolated area they stopped the car, took off the stolen license plates, and restored the rented car's regular plates. With the boy concealed on the floor of the back seat, Bromley drove the car to Baker's house; Baker got out and opened the garage door, and Bromley drove the car into the garage. Bromley

testified that Baker "had the little boy get out and lay down on the canvas, and then we picked him up and carried him inside the house."

According to Bromley's testimony, the final disposition of the boy had not been agreed upon—that is, the criminals had not decided when and where he would be left. Inside the house, Bromley heard both Baker and the boy talk to the boy's father on the telephone, and "Then we picked the boy up, and took him back out to the garage, and put him back in the garage," where they kept the boy for some time under a blanket.

The confession in open court proceeds. After a while, they drove out to the Park-N-Shop to a rendezvous with Evans:

And so the first time we got there—this was after the call had been made to Mr. Hyde—we ended up near, at the Park-N-Shop some way. He got out, him and Jim Evans walked into that, the Park-N-Shop for a few minutes, and they was right back out. And then we left again. Then the second time that we come around was for the ransom pick-up.

Note that Evans and Baker had a conference in the Park-N-Shop grocery store while Bromley stayed in the car where the boy as his prisoner lay concealed. Thus, according to Bromley, they made the ransom pickup on a second trip to the Park-N-Shop. After getting the money, they drove with the boy out on to the river road (toward Puyallup) and then, reversing their direction, swung north toward the north end of the city of Tacoma. Out near the bay in the north end of the Old Tacoma district, they found an old cement shack, and, testified Bromley:

Yes. I had him hold his arms together, you know, wrist to wrist, and I taped his, taped it around his wrists. And then I handed him a piece of tape—well, before I taped his wrists, I had, handed him a piece of tape, and had him put it over his eyes, and over his mouth. . . .
Yes, his wrists were together like this (indicating), fairly far apart because I had to get the tape back around through his hands.

There they left the boy. Bromley says that later he, with his wife, followed Baker to Steve's Gay 90's (a restaurant in South Tacoma) where Baker gave Bromley his share of the ransom money. According to Bromley's testimony, he and his wife had their personal traveling effects with them in their car when they followed Baker to the restaurant and Bromley had made airplane reservations for himself and his wife to Little Rock, Arkansas. They got on the plane the next morning with Bromley's share of the ransom money in his possession. He rang down his testimony with a final assertion that, except for the threats against his life on the 17th day of November, 1965, he would not have participated in the kidnapping.

Thus, from the lips of the defendant in open court under oath on direct examination, when testifying in his own defense, came a complete acknowledgment of guilt—detailed, corroborated, specific, and conclusive as to all elements of the crime, including his intent, volition, and knowledge. His only justification is a claim of duress and coercion through fear. But his own testimony completely excludes any possibility of such a defense and conclusively establishes that such a claim, as a matter of law, was not available to him, for one cannot exculpate his crime through fear unless the danger is shown to be immediate and continuing. If one has a reasonable opportunity to avoid doing the act without exposing himself to danger of instant death or grievous injury, he has not, as a matter of law, been coerced.

The very statute (RCW 9.01.112), under which defendant claimed his immunity from punishment, emphasizes the idea that the danger must be immediate and imminent:

> Whenever any crime, except murder, is committed or participated in by two or more persons, any one of whom participates only under compulsion by another engaged therein, who by threats creates a reasonable apprehension in the mind of such participator that in case of refusal he is liable to *instant death or grievous bodily harm,* such threats and apprehension constitute duress, which will excuse such participator from criminal prosecution. (Italics mine.)

Blackstone long ago said it differently, emphasizing not the immediacy but the genuineness of the fear and excluding it as a defense in all cases for murder:

Another species of compulsion or necessity is what our law calls *duress per minas;* or threats and menaces, which induce a fear of death or other bodily harm, and which take away, for that reason, the guilt of many crimes and misdemeanors, at least before the human tribunal. But then that fear which compels a man to do an unwarrantable action, ought to be just and well-grounded; . . . . And therefore, though a man be violently assaulted, and has no other possible means of escaping death but by killing an innocent person, this fear and force shall not acquit him of murder, for he ought rather to die himself than escape by the murder of an innocent. 4 Blackstone, Commentaries 30 (Adapted by Robert Malcolm Kerr, 1962).

Our statute, however, as we have noted, requires that the danger must be immediate to constitute a defense and to this the courts have added another sensible condition—that it must be continuing with no chance for avoidance. *Shannon v. United States,* 76 F.2d 490 (10th Cir. 1935) sets forth the federal rule as follows, at 493:

Coercion which will excuse the commission of a criminal act must be immediate and of such nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. One who has full opportunity to avoid the act without danger of that kind cannot invoke the doctrine of coercion and is not entitled to an instruction submitting that question to the jury.

If, then, the danger from which the coercion and duress are claimed to emanate is not immediate, imminent and impending and does not create a reasonable fear of instant death or grievous bodily injury, and does not continue throughout the time when the crime is being perpetrated, it is no true duress and coercion at law. Similarly, threat or fear of future injury will not constitute a defense of duress and coercion. 21 Am. Jur. 2d *Criminal Law* § 100 (1965). See *R. I. Recreation Center v. Aetna Cas. & Surety Co.,* 177 F.2d 603, 12 A.L.R.2d 230 (1st Cir. 1949); *Shannon v.*

*United States, supra; State v. St. Clair,* 262 S.W.2d 25, 40 A.L.R.2d 903 (Mo. 1953); *State v. Good,* 110 Ohio App. 415, 165 N.E.2d 28 (1960); Newman & Weitzer, *Duress, Free Will and the Criminal Law,* 30 S. Cal. L. Rev. 313 (1957).

Bromley's testimony discloses his intentional participation in the planning, execution of, and flight from the completed kidnapping of young Charles Hyde during a period of about 10 days. His testimony reveals that, throughout the criminal scheme, he was free of the danger of instant death and grievous bodily harm for much greater periods than he was exposed to it. All during the development of the criminal plan and throughout the conferences among the three criminals, and continuing on into the first abortive attempt, Bromley, by his own testimony, had innumerable chances not only to withdraw from the criminal enterprise, but to protect himself from the danger claimed to be menacing him, by reporting his fear to the sheriff, the Tacoma police or the FBI—or to his neighbors, relatives and friends. Indeed, during a large part of the planning stages, police and sheriff's offices were undoubtedly more accessible to Bromley than Bromley to Baker.

There being no substantial evidence to support coercion and duress as that defense is known to the law, defendant was not entitled to instruction No. 25 which submitted it to the jury. In instructing upon coercion and duress, the court gave defendant a gratuitous benefit, for one is not entitled to an instruction unsupported by the evidence. Accordingly, it should be quite clear that, when the state sought to meet an unwarranted defense by erroneously proving through the testimony of Dr. Harlan McNutt that Bromley's personality was not readily susceptible to coercion and duress by a fellow conspirator, the error was manifestly harmless and trivial.

One collateral point should be mentioned: In reciting the most significant parts of Bromley's direct examination to show that he actually confessed under oath in open court, it is not implied that his testimony had the procedural effect of a plea of guilty or empowered the court to thereupon

dismiss the jury and enter a judgment of guilty. The open-court confession, however damning it may have been as to the facts, did not deprive defendant of the right to a jury trial for his plea of not guilty gave him the right to their deliberations and findings expressed in a verdict. Const., art. 1 § 21; Const., art. 1 § 22 (amendment 10); RCW 10.01.060; 2 Wharton, Criminal Evdence § 336 (12th ed. 1955). His testimony did not preclude the ultimate power of the jury to render a verdict, but, rather, obviated the defense of coercion and duress.

Did the court discharge its full constitutional duty to this defendant? Indeed it did. It supplied him with highly competent and industrious counsel; it gave full opportunity for investigation and preparation of a defense with the power of subpoena and the right to confrontation of witnesses. It brought him to trial on specific charges before a fair and impartial jury drawn from the county at large. The court allowed him full opportunity to testify or refrain from testifying. That he elected to take the witness stand, revealing through several thousand words of testimony his participation in a despicable crime, in a desperate effort to erect a defense where none existed does not detract from the scrupulously high standards maintained by the trial court.

When a man is guilty, it is altogether right that he be adjudged guilty. There being no doubt as to defendant's guilt, and an abundant record that his guilt was fairly arrived at, I would not reverse on what seems to me to be a harmless error. Accordingly, I would affirm.