[No. 58970-4.   En Banc.   March 3, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. DEBORAH ANN RIKER, *Appellant*.

*Jeffrey E. Ellis* of *Seattle-King County Public Defender Association*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Brenda Louise Bannon* and *Carol D. Spoor, Deputies*, for respondent.

*James E. Lobsenz* on behalf of Northwest Women's Law Center, amicus curiae for appellant.

DURHAM, J. — Deborah Riker raised the defense of duress to charges of delivery and possession of cocaine. She claimed that a police informant, Rupert Burke, coerced her into the crime with verbal threats. She also contended that her history as a battered woman in other relationships should have been made known to the jury, and she offered the testimony of an expert on the subject. The trial court instructed the jury on duress and allowed Riker to make a brief statement to the jury about her earlier batterings. However, the trial court disallowed the testimony of the expert witness. Riker claims that ruling was erroneous and also questions the trial court's instructions on the burden of proof. We affirm.

When raising a duress defense, the defendant admits the truth of the State's allegations, but contends that her actions should be excused. We will begin by relating the State's version of these events. In 1987, police officer John Pritchard and Rupert Burke, a paid police informant, were posing as marijuana growers looking to buy illegal guns. During the course of that investigation, Burke met the defendant's sister, Suzanna Rohrer. On June 16, 1987, Rohrer set up a cocaine deal with Riker.

Burke and Rohrer drove to Riker's house where Burke observed the two women measuring out approximately an eighth of an ounce of cocaine (an "eightball") on a triple beam scale. The defendant commented that the cocaine was from the bottom of a kilogram bag. Burke paid Riker $250 for the cocaine, and she told Burke that he could call her directly if he wanted more cocaine. She gave him her phone number.

On June 18, 1987, Burke, with three officers present, called Riker from a pay phone to purchase more cocaine. They met at a truck stop, where Riker delivered another

eightball of cocaine in exchange for $250. According to Burke, Riker also offered to deliver larger quantities of cocaine in the future.

A few days later, Burke met with Riker again at her house to discuss the sale price of a pound of cocaine. They agreed on $18,000. Riker said that her cocaine supplier was named "Bill". On June 25, 1987, Riker invited Burke and Pritchard to her house. When they arrived, Burke went inside the house while Pritchard remained in the car. Riker delivered a sixteenth of an ounce of cocaine to Burke in exchange for $125. The defendant then went outside and was introduced to Pritchard, who posed as a marijuana runner. Pritchard testified that Riker told him that she had done pound deals before, and that she wanted to go back to dealing pounds.

The final agreement was that Burke would meet the defendant at the SeaTac Mall parking lot and exchange a pound of cocaine for $18,000. On July 16, 1987, Burke went to the mall with the money. At about 1:15 p.m., Riker arrived at the mall. They entered the mall through a door near where Burke was parked, and then exited after a few minutes.

About 5 minutes later, a pickup truck pulled up to Burke's car. The man introduced himself as "Bill". Burke left with Bill in the truck. A third man entered the truck and showed Burke the pound of cocaine, and they then drove back to Burke's car in order to count the money. At this point, Burke signaled to the police and both men were arrested.

Riker was arrested that evening. A subsequent search of her home disclosed an O'Haus Triple Beam scale in the bedroom closet, a .22-caliber pistol, $1,400 in cash and some food stamps. Also recovered was a "bullet", a device used to inhale cocaine, and a small amount of marijuana. No cocaine was found in the residence.

While Riker agrees with most of the facts as stated above, she claims that the tale is not so simple. Rather, she denies any previous involvement with cocaine, and states that she participated in these events only because of the pressure exerted on her by the informant, Rupert Burke.

Although she was unable to testify to any explicit threats by Burke, she claims that her previous history of abuse has left her a "battered woman" and affected her ability to resist the alleged coercion. Briefly, her testimony is as follows.

### Testimony of Deborah Riker

Riker first met Burke in the spring of 1987 at her sister's house. At the time, she thought that Burke was involved with a marijuana growing organization and that he was emotionally involved with her sister.

Riker's testimony was vague as to the threats employed by Burke. She testified that once, Burke forced her sister to give Riker some rings in exchange for $20 to buy cocaine. Riker also testified that, according to her sister, Burke had "pushed [Rohrer] against the wall once . . . and then verbally he [Burke] was abusing her". Report of Proceedings (RP), at 591. Riker stated that Burke threatened that Rohrer would "more or less . . . suffer[] the consequences" if Riker did not obtain cocaine for him. RP, at 591.

Riker contends that she participated in the first cocaine sale only because Burke threatened to harm her sister unless she got cocaine. Riker stated that, although she has never used or dealt drugs, she was able to obtain an eighth of an ounce of cocaine on credit quickly from her ex-husband's former prison cellmate, Bill Smith.

Riker testified that Burke later called her to demand more cocaine. She said that she tried to resist, but that he told her, "Well, you will know the consequences." RP, at 599. She believed that the consequences would be physical harm to her or her sister. However, she also testified that she had never seen any bruises on her sister, that Burke had never hit Riker, and that Burke had never made his threat more specific.

Riker also testified that Burke coerced her into selling larger amounts of cocaine with the statement, "You will know the consequences." RP, at 607. Riker denied that she had sold pounds before but admitted making arrangements for the pound deal. She claimed that she was only at the mall on July 16 to go shopping.

Finally, Riker testified regarding her history of abusive relationships to support her duress defense. The trial court ruled that she could present this testimony, but not in undue detail. Riker claimed that she had been physically and sexually abused in numerous relationships since she was young, most recently a little over a year before she met Burke. She stated that her abusive relationships played a part in her fear of Burke, and that she believed that Burke would hurt her or her sister if she did not comply with his requests.

Expert Testimony on Battered Woman Syndrome

As an additional part of her defense, Riker attempted to introduce the testimony of Karil Klingbeil, an expert on the battered woman syndrome. In her offer of proof, Klingbeil testified that battered woman syndrome is generally considered a subset of post-traumatic stress syndrome. Klingbeil considered the relationship and the continuum of violence to be a very important aspect in arriving at a diagnosis that a person suffers from the battered woman syndrome.

Klingbeil also described some of the behavioral characteristics that normally accompany the battered woman syndrome. For instance, she testified that such women usually exhibit "learned helplessness". She explained that such a condition occurs when the woman is subjected to "repeated threats, fears, coercion, physical battering episodes, most of which are predictable" such that she comes to feel she has no options. RP, at 536-37.

Klingbeil also testified that, in her opinion, Riker was a battered woman in June and July of 1987. She based her opinion on Riker's history of abusive relationships with the significant men in her life and stated that Riker's association with Burke could not be separated out from her prior relationships. However, Klingbeil admitted that use of the battered woman syndrome in a case where there was not an intimate relationship between the batterer and the victim was novel, and that she could not cite any studies applicable to this situation. Following this offer of proof, the trial court ruled that the testimony was inadmissible.

At the close of the trial, the court took exceptions from counsel as to the jury instructions. The prosecutor had no objections to an instruction on duress. Both the State and the defendant agreed with the court's proposal not to instruct the jury regarding the applicable burden of proof on the duress defense. However, during deliberations, in response to a question from the jury, the court instructed the jury that the defendant had the burden of proving duress by a preponderance of the evidence. The jury found Riker guilty on all four counts. Riker received a sentence at the lowest end of the standard range—46 months—on each count, to be served concurrently. Riker appealed to the Court of Appeals and the case was transferred to this court.

### EXCLUSION OF EXPERT TESTIMONY

Riker relied on the theory of duress to excuse her actions. The elements of duress are:

> (a) The actor participated in the crime under compulsion by another who by threat or use of force created an apprehension in the mind of the actor that in case of refusal he or another would be liable to immediate death or immediate grievous bodily injury; and
>
> (b) That such apprehension was reasonable upon the part of the actor; and
>
> (c) That the actor would not have participated in the crime except for the duress involved.

RCW 9A.16.060(1). Riker offered Dr. Klingbeil's expert testimony on the battered woman syndrome to support her duress defense; specifically, to show that her apprehension of immediate harm from Burke was reasonable. The trial court excluded the testimony because it "would not be helpful and is not needed in this defense". RP, at 572.

■ The battered woman syndrome is a collection of behavioral and psychological characteristics exhibited by victims of a prolonged, repetitive pattern of physical and emotional abuse at the hands of their partners. *United States v. Johnson*, 956 F.2d 894, 899, *opinion supplemented on denial of rehearing sub nom. United States v. Emilio*, 969 F.2d 849 (9th Cir. 1992); RP, at 530. *See generally* Lenore E. Walker, *The Battered Woman Syndrome* (1984). It is consid-

ered a subset of post-traumatic stress disorder, which is "an anxiety-related disorder which occurs in response to traumatic events outside the normal range of human experience". *State v. Janes*, 121 Wn.2d 220, 233, 850 P.2d 495 (1993). We have previously admitted expert testimony on the battered person syndrome to show how severe abuse within the context of a battering relationship affects the battered person's perceptions and reactions in ways not immediately understandable to the average juror. *See Janes*, at 236; *State v. Ciskie*, 110 Wn.2d 263, 271-74, 751 P.2d 1165 (1988); *State v. Allery*, 101 Wn.2d 591, 596-98, 682 P.2d 312 (1984). The battered person syndrome is admitted in self-defense cases to illustrate and explain the "reasonableness" of the defendant's actions. *Allery*, at 596-98. The admissibility of expert testimony on the battered person syndrome to explain the defendant's actions outside of a battering relationship is a matter of first impression in this jurisdiction. Given the current state of scientific acceptance, we hold that the testimony was properly rejected.

The admission of scientific testimony involves two related inquiries, each governed by separate standards. First, has the scientific theory or principle from which the evidence is derived garnered general acceptance in the relevant scientific community under the standard of *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923)? Second, is the expert testimony properly admissible under ER 702? *Janes*, at 232; *State v. Cauthron*, 120 Wn.2d 879, 885, 846 P.2d 502 (1993).

In examining the *Frye* question, we look to see: (1) whether the underlying theory is generally accepted in the scientific community and (2) whether there are techniques, experiments, or studies utilizing that theory which are capable of producing reliable results and are generally accepted in the scientific community. *Cauthron*, at 888-89. Under the *Frye* standard, our task is not to determine if the scientific theory underlying the proposed testimony is correct; rather, we look to see whether it has achieved general acceptance in

the appropriate scientific community.[1] *Cauthron*, at 887. "The core concern of *Frye* is only whether the evidence being offered is based on established scientific methodology. This involves both an accepted theory and a valid technique to implement that theory." *Cauthron*, at 889.

██ Applying these standards to the case before us, we do not question the general acceptance of the battered person syndrome theory. *See Janes*, at 234-36; *State v. Ciskie, supra; State v. Allery, supra.* Rather, our concern here involves the second part of the *Frye* test. Heretofore, the syndrome has been admitted only in cases in which the batterer and the victim have developed a strong relationship, usually over a period of years. *See Janes*, at 223 (surrogate father/son relationship); *Ciskie*, at 265 (2-year romantic relationship); *Allery*, at 592 (husband/wife relationship). The context in which the defense is raised here is entirely different. The defendant's relationship to the person whom she claims coerced her was brief, business-oriented, and without any history of physical abuse. "[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes". *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 576, 125 L. Ed. 2d 469, 113 S. Ct. 2786, 2796 (1993). The absence of any studies to support the extension of the battered woman syndrome to these facts is troubling.

Throughout her testimony, Dr. Klingbeil emphasized the importance of the relationship between the *batterer and the victim* in battered person cases, and how the syndrome helps to explain the victim's actions within such a relation-

---

[1]We recognize that the United States Supreme Court has recently held that the *Frye* standard is not applicable under the Federal Rules of Evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 576, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). Nevertheless, in this state, we continue to adhere to the view that the *Frye* analysis is a threshold inquiry to be considered in determining the admissibility of evidence under ER 702. However, we find that many of the "general observations" made by Justice Blackmun in the majority opinion may be of use to trial judges in making the threshold *Frye* determination. *See Daubert*, 113 S. Ct. at 2796-98. Even were we to adopt the *Daubert* analysis, the testimony at issue here would be inadmissible.

ship. She agreed that any attempt to explain the effect of such batterings on a victim's interactions with nonbatterers outside of the battering relationship would be a departure from the "classic" battered woman syndrome:

Q: And as well as when looking in terms of what they [battered women] would perceive as a person was making threats toward them, they would feel more endangered because of the experience that they have had with this person?

A: The repetitive nature of it, yes, that's true.

Q: That's a fairly important aspect of the battered woman's syndrome; is that a fair statement?

A: Well, learned helplessness is not universally found in all battered women . . .

. . . .

Q: Now, this situation is quite a bit different than the classic situation?

A: Yes, it's certainly a departure from the classic.

Q: And the reason why it's a departure is?

A: Well, number one, there is not a homicide here, so we don't have a murder and we don't have a woman defending herself against the threat of being killed.

Q: But why else would it be a departure in your opinion?

A: Well, I think it's an extension of the use of the battered woman syndrome. . . .

. . . .

Q: The battered woman syndrome in the classic battered woman's syndrome, the testimony has been admitted it generally is in response to something, would you agree, more in terms of either inaction or responding to defend themselves, it generally —

A: Flight or fight[.]

Q: Flight or fight. It generally does not involve a situation where [a battered woman has] engaged in affirmative conduct such as going out and committing crimes?

A: You use the word "generally," so I guess I would have to agree with you.

RP, at 549-50, 552.

Significantly, Dr. Klingbeil agreed that the fear a battered woman would have of refusing the requests of her abuser would be substantially different from the fear she would experience if the same requests came from a stranger. Later, Dr. Klingbeil was asked about the scientific verification of this extension of the battered woman syndrome:

Q: . . .What studies have been done regarding that specific area? What cases have you evaluated which are exactly like this or very similar?

A: Well, as a matter of fact, there aren't a lot of similar cases that I have been involved in. As I explained to you earlier, this is a fairly recent use of the battered woman syndrome being used throughout the country and so there has not been lots of studies on that.

. . . .

Q: . . . but would it be safe to say there has not been enough studies done where it is generally accepted within the field?

A: Actually I don't know that I could answer that question.

Q: You would agree that this is somewhat and excuse my phrasing, somewhat of a novel use of the battered woman's syndrome?

A: Yes, it is more an extension as I referred to it.

Q: Did you rely on any literature when coming to your opinion in this case?

A: Well, the issue of fear and its definition and intimidation, duress are all found in the literature . . .. It can be teased out of the literature.

Q: You have not yourself done any studies similar to this one?

A: I have not done any studies just on the use of battered woman's syndrome without a homicide case, that is correct.

RP, at 553-55.

From Dr. Klingbeil's own testimony, we are unable to conclude that this extension of battered person principles has achieved general acceptance in the appropriate scientific community. This conclusion is bolstered by our own survey of available literature and other cases, none of which appear to lend significant support to the application of such principles in this case. *See, e.g.,* Lenore E. Walker, *The Battered Woman* xiv (1979) (studying effects of battering only in the context of a relationship with husband or lover); Lenore E. Walker, *The Battered Woman Syndrome* (1984) (describing effects of battering only in context of relationship with husband or lover); Lenore E. Walker, *Battered Women Syndrome and Self-Defense*, 6 Notre Dame J.L. Ethics & Pub. Pol'y 321 (1992) (exploring use of syndrome to explain criminal acts committed due to duress from battering partner). Indeed, we are unaware of any reported decisions which have admitted expert testimony on

this syndrome outside of the context of a relationship between the batterer and the victim.[2] The dissent is similarly unable to provide such authority. Dr. Lenore Walker, the preeminent authority on the battered woman syndrome, limits her own analysis to the following scenario:

> we consider a woman to be battered if she is subjected *repeatedly* to coercive behavior (physical, sexual, and/or psychological) by a man attempting to force her to do what he wants her to do, regardless of her own desires, rights, or best interests; if she is *intimately involved* with this man [but not] necessarily married, although she often is; and if, *as a couple*, they have experienced at least two acute battering incidents, often going through the Cycle of Violence at least twice.

(Italics ours.) Lenore E. Walker, *Terrifying Love* 102 (1989).

We find that use of battered woman syndrome to explain behaviors outside of the context described above has not yet achieved the general scientific acceptance necessary under *Frye*. Specifically, we find that there have not been sufficient studies of the application of the general principles comprising the battered woman syndrome to the precise context here — a non-battering, non-intimate relationship — to warrant acceptance of the testimony in this case.

The fundamental flaw in the dissent's analysis of this issue is its failure to consider the second prong of the *Frye* inquiry. As recently noted by the United States Supreme Court, "scientists typically distinguish between 'validity' (does the principle support what it purports to show?) and 'reliability' (does application of the principle produce consistent results?)." *Daubert*, 113 S. Ct. at 2795 n.9. Similarly, the gatekeeping function of *Frye* requires both an accepted theory and a reliable method of applying that theory to the facts of the case. Without studies documenting the effect, if

---

[2] In *United States v. Johnson*, 956 F.2d 894, *opinion supplemented on denial of rehearing sub nom. United States v. Emilio*, 969 F.2d 849 (9th Cir. 1992), such testimony was allowed, but held to be relevant to sentencing only. The question before the court was whether "a special vulnerability to fear — a vulnerability not produced by those persons causing the defendant's criminal action — may be taken into account." *Johnson*, at 898. The court found such subjective vulnerability was not adequate for a defense of duress, but could be considered in sentencing. *Johnson*, at 900.

any, that prior battering relationships will have on a person's functions and reactions outside of those relationships, the expert's opinion amounts to no more than an unsupported guess.

The trial court also excluded the expert testimony as not being helpful to the jury under ER 702,[3] which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 702. Admissibility under this rule hinges on two separate determinations: (1) Does the witness qualify as an expert and (2) Would that expert's testimony be helpful to the trier of fact? *Cauthron*, 120 Wn.2d at 890. The first part of this inquiry was never at issue since the parties stipulated at trial that Dr. Klingbeil is an expert on the battered woman syndrome. This court has similarly accepted her testimony in numerous cases. *See Allery*, 101 Wn.2d at 595; *State v. Kelly*, 102 Wn.2d 188, 685 P.2d 564 (1984); *Ciskie*, 110 Wn.2d at 271.

■ Expert testimony will be helpful to the jury only if its relevance has been established. *State v. Petrich*, 101 Wn.2d 566, 575, 683 P.2d 173 (1984); *State v. Hanson*, 58 Wn. App. 504, 508, 793 P.2d 1001, *review denied*, 115 Wn.2d 1033 (1990). Helpfulness and relevancy are intricately intertwined:

> The helpfulness test subsumes a relevancy analysis. In making its determination, the court must proceed on a case-by-case basis. Its conclusions will depend on (1) the court's evaluation of the state of knowledge presently existing about the subject of the proposed testimony and (2) on the court's appraisal of the facts of the case.

*State v. Reynolds*, 235 Neb. 662, 683, 457 N.W.2d 405, 419 (1990) (quoting 3 Jack B. Weinstein & Margaret A. Berger, *Evidence* 702-18 (1988)). Here, the expert testimony was offered to show that Riker's history of abuse built a cumula-

---

[3]A trial court's rulings under ER 702 are reviewed using an abuse of discretion standard. *State v. Kalakosky*, 121 Wn.2d 525, 541, 852 P.2d 1064 (1993).

tive patina of fear which resulted in her inability to resist or escape Burke's alleged coercion. As explained above, however, there was an inadequate foundation for establishing the probative value of the battered person syndrome outside of a battering relationship. Riker and Burke were passing acquaintances whose limited contacts occurred mainly by telephone and over only a brief period of time. There was, thus, an insufficient basis established for use of the battered person syndrome in this unique set of circumstances.

■ Exclusion of Dr. Klingbeil's testimony in this case also accords with the law's traditional skepticism regarding the defense of duress.[4] Washington's duress statute itself reflects our reluctance to allow even the abnormal stresses of life to provide a basis for the defense. Unlike self-defense, which only requires an apprehension of "imminent" danger, our duress statute requires an apprehension of "immediate" harm. *Compare* RCW 9A.16.050 (self-defense) *with* RCW 9A.16.060 (duress). *See also Janes*, at 241 (pointing out the difference between "imminent" and "immediate"). The defense of duress is also unavailable to defend against a charge of murder or manslaughter. RCW 9A.16.060(2). Whereas someone who acts in self-defense acts against the very person pressuring him or her, an actor who successfully raises a duress defense is freed from criminal liability for harm caused to an innocent third party. The more stringent requirements for the duress defense are a result of the more socially harmful outcome allowed by this defense, and reflect

---

[4]Discussing the duress defense, one expert on criminal law defenses has explained that: "[W]here an actor engages in criminal conduct with the same knowledge and appreciation of its nature, consequences, and wrongfulness or criminality as a normal person, yet claims lack of control, and the lack of control is not so complete as to make the conduct involuntary . . . the law is generally unwilling to excuse unless there is a clear, confirmable, almost compelling disability. But further, unlike any other excusing condition, this impairment of control condition [duress] must be of a certain degree. Everyone is subject to pressures and temptations to engage in criminal conduct. For this type of condition to provide an excuse, the loss of control must be sufficiently serious that the actor has, at least temporarily, entered the realm of abnormality." Paul H. Robinson, *Criminal Law Defenses: A Systemic Analysis*, 82 Colum. L. Rev. 199, 226 (1982).

society's conclusion that, as a matter of public policy, the defense should be limited.[5] Hence, we hold that, under the facts of this case, the trial court did not abuse its discretion in excluding expert testimony on the battered woman syndrome.

## BURDEN OF PROOF FOR DURESS

The trial court instructed the jury that the defendant had the burden of proving duress by a preponderance of the evidence. Although both Riker and the State agree that she had the burden of proof, Riker argues that she had to prove the defense only to the extent that it created a reasonable doubt in the minds of the jurors as to her guilt. This, she argues, is a lower standard than "preponderance of the evidence" and the failure to specify the proper burden necessitates a new trial.[6]

■■ Duress is an affirmative defense. *State v. Razey*, 54 Wn.2d 422, 426-27, 341 P.2d 149 (1959). Normally, affirmative defenses must be proved by the defendant by a preponderance of the evidence. *State v. Camara*, 113 Wn.2d 631, 639-40, 781 P.2d 483 (1989) (consent defense to rape); *State*

---

[5]Without requiring a foundation which would distinguish Debbie Riker's fear from that of every other citizen who has a troubled past, there is a danger that the evidentiary doors will be thrown open to every conceivable emotional trauma. *See Janes*, at 239-40. Ultimately, the jury's finding of duress would rest upon sympathy for the defendant, rather than an evaluation of her present danger. These considerations are more appropriately a part of sentencing. *See State v. Pascal*, 108 Wn.2d 125, 139, 736 P.2d 1065 (1987) (upholding diminished capacity due to battered woman syndrome as a mitigating factor in sentencing); *United States v. Johnson*, 956 F.2d 894, *opinion supplemented on denial of rehearing sub nom. United States v. Emilio*, 969 F.2d 849 (9th Cir. 1992) (explaining use of syndrome for reduction of sentence under federal sentencing guidelines).

[6]Alternatively, amicus, the Northwest Women's Law Center, argues that the State, not the defendant, bears the burden of proving the absence of duress under *State v. Davis*, 27 Wn. App. 498, 618 P.2d 1034 (1980). However, the *Davis* court seems to have overlooked our previous decision holding that the burden of proving the affirmative defense of duress lies with the defendant. *State v. Razey*, 54 Wn.2d 422, 426-27, 341 P.2d 149 (1959). Moreover, the Court of Appeals has since rejected the dicta in *Davis* suggesting that a person acting under duress acts "lawfully". *State v. Russell*, 47 Wn. App. 848, 852-53, 737 P.2d 698, *review denied*, 108 Wn.2d 1032 (1987). The State, in carrying the burden of proving each element of an offense, does not bear the burden of disproving a claim of duress. We disapprove of *Davis* to the extent it suggests otherwise.

*v. Rice*, 102 Wn.2d 120, 122-26, 683 P.2d 199 (1984) (lack of knowledge defense to accomplice liability); *State v. Moses*, 79 Wn.2d 104, 110, 483 P.2d 832 (1971) (treaty exemption defense to violation of fishing laws), *cert. denied*, 406 U.S. 910 (1972); *State v. Mays*, 65 Wn.2d 58, 68, 395 P.2d 758 (1964) (insanity defense), *cert. denied*, 380 U.S. 953 (1965); *State v. Knapp*, 54 Wn. App. 314, 320-22, 773 P.2d 134 ("unwitting possession" defense), *review denied*, 113 Wn.2d 1022 (1989); *State v. Gilcrist*, 25 Wn. App. 327, 328-29, 606 P.2d 716 (1980) (involuntary intoxication defense). This is so because generally, affirmative defenses are uniquely within the defendant's knowledge and ability to establish. *Knapp*, at 320-22.

Nevertheless, in the context of duress, we have previously stated that the defendant need only prove the defense "to the extent of creating a reasonable doubt in the minds of the jurors as to the [defendant's] guilt . . .." *State v. Bromley*, 72 Wn.2d 150, 155, 432 P.2d 568 (1967). Riker contends that the trial court, by instructing the jury that the duress defense must be proved by a preponderance of the evidence, placed upon her a higher burden than that called for in *Bromley*. However, upon close examination, we do not think that the burden described by the trial court is at all dissimilar from that enunciated in *Bromley*.

The burden of proof described in *Bromley* is perplexing at best. The two cases upon which it relied involved alibi defenses. *State v. Pistona*, 127 Wash. 171, 219 P. 859 (1923); *State v. Rosi*, 120 Wash. 514, 208 P. 15 (1922). An alibi defense denies that the defendant committed the crime. *State v. Johnson*, 19 Wn. App. 200, 205, 574 P.2d 741 (1978). As such, an alibi defense negates an element of the crime, making it proper to require that the defendant prove the defense only to the extent that it creates a reasonable doubt as to his or her guilt. A successful alibi will make it impossible for the State to prove the defendant guilty beyond a reasonable doubt.

In contrast, a defense of duress *admits* that the defendant committed the unlawful act, but pleads an excuse for

doing so. *See State v. Russell*, 47 Wn. App. 848, 853, 737 P.2d 698, *review denied*, 108 Wn.2d 1032 (1987). The duress defense, unlike self-defense or alibi, does not negate an element of an offense, but pardons the conduct even though it violates the literal language of the law.[7] *State v. Peters*, 47 Wn. App. 854, 859, 737 P.2d 693, *review denied*, 108 Wn.2d 1032 (1987); *United States v. Johnson*, 956 F.2d 894, 897-98, *opinion supplemented on denial of rehearing sub nom. United States v. Emilio*, 969 F.2d 849 (9th Cir. 1992). *See also* Paul H. Robinson, *Criminal Law Defenses: A Systemic Analysis*, 82 Colum. L. Rev. 199, 225 (1982) (noting that a duress defense recognizes that the conduct was intentional, but is excused because of a defect in control). A successful duress defense does not create a reasonable doubt that the defendant did the crime charged, but rather condones the defendant's admittedly unlawful conduct. Any burden of proof for duress which literally relies on the ability of the defendant to create a reasonable doubt would therefore be impossible to meet, since a duress defense necessarily allows for no doubt that the defendant did the acts charged.

The language in *Bromley* is admittedly confusing. In attempting to establish an evidentiary threshold, the bar was placed too high. Generally, an affirmative defense which does not negate an element of the crime charged, but only excuses the conduct, should be proved by a preponderance of the evidence. *Rice*, 102 Wn.2d at 124-26; *see also State v. Box*, 109 Wn.2d 320, 323-30, 745 P.2d 23 (1987) (discussing the differences between defenses which negate an element of the crime and those that only excuse the crime). The only logical reading of *Bromley* is that, as with most affirmative defenses which do not negate an element of the crime, the defendant must prove duress by a prepon-

---

[7] If duress did negate an element of the crime, it would be nearly impossible to justify the murder/manslaughter exception in the statute. *See* RCW 9A.16.060(2). *See generally* Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 49, at 374 n.3 (1972).

derance of the evidence.[8] Thus, we affirm the trial court's instruction to the jury.

### OTHER CLAIMED ERRORS

The defendant raises four additional arguments. After reviewing each of these arguments, we conclude that none have merit.

■ First, Riker contends that the trial court erred in limiting the scope of her testimony regarding her history of abusive relationships. The trial court permitted Riker to testify as to her past abusive relationships, but not in undue detail. It limited her detailed testimony under ER 403, which allows relevant evidence to be excluded if its probative value is substantially outweighed by the danger of prejudice, confusion of the issues, misleading the jury or by considerations of undue delay. The trial court has broad discretion in balancing the requisite factors under ER 403, and its determination will not be reversed on appeal absent an abuse of discretion. *State v. Coe*, 101 Wn.2d 772, 782, 684 P.2d 668 (1984). A review of Riker's offer of proof demonstrates that the trial court acted reasonably.

■ Second, Riker argues that the trial court erred in excluding Kim Tonge's testimony regarding a conversation Riker had with someone named "Bill". The trial court heard an offer of proof on Tonge's testimony and issued a tentative ruling on its admissibility. Riker did not call Tonge, nor was there a request for a final ruling on the admissibility of her testimony. A defendant who does not seek a final ruling on a motion in limine after a court issues a tentative ruling waives any objection to the exclusion of the evidence. *State v. Carlson*, 61 Wn. App. 865, 875, 812 P.2d 536 (1991).

■ Third, Riker argues that trial court erred in not requiring Burke to answer certain questions on cross and

---

[8]The Court of Appeals recently grappled with the language in *Bromley* and ultimately concluded that "[t]he defendant must produce sufficient evidence of duress to raise a doubt in the jury's mind as to his guilt". *State v. McAlister*, 71 Wn. App. 576, 584, 860 P.2d 412 (1993). We disapprove of *McAlister* to the extent that it suggests the defendant's burden of proof is something other than a preponderance of the evidence.

re-cross examination regarding his residence and previous employment. Burke refused to answer these questions because he feared retaliation from Riker's cocaine supplier. Riker did not ask the court to instruct Burke to answer, nor did she attempt to make an adequate offer of proof on the excluded testimony. This issue also has not been adequately preserved for appellate review.

Finally, Riker argues that the trial court erred in denying her motion for a mistrial. A court's denial of a motion for a mistrial is reviewed under the abuse of discretion standard. *State v. Essex*, 57 Wn. App. 411, 415, 788 P.2d 589 (1990). Riker's attorney talked about Riker's history of abusive relationships in his opening statement; however, Riker was later prohibited from testifying in undue detail about those past relationships. At the close of trial, however, the jury was instructed not to take into consideration any statements made by counsel about the defendant's past which were not supported by the evidence. The jury is presumed to have followed the court's instructions. *State v. Kroll*, 87 Wn.2d 829, 835, 558 P.2d 173 (1976).

In sum, we find that the trial court properly excluded the offered expert testimony, properly limited the defendant's testimony, and correctly instructed the jury on the burden of proof. We do not find that any of the other claimed errors warrant a new trial. We affirm the convictions.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, SMITH, and GUY, JJ., concur.

UTTER, J. (dissenting) — The majority holds the battered woman syndrome testimony was not admissible in this case because it failed to meet the foundational requirements necessary to support Riker's defense of duress. I disagree. The majority imposes on the admissibility of the battered woman syndrome a requirement that is legally unwarranted on this record.

The majority's rationale for excluding the testimony is that [h]eretofore, the syndrome has been admitted only in cases in which the batterer and the victim have developed a strong relationship, usually over a period of years. . . . The context in which the defense is raised here is entirely different.

Majority, at 360.

The fact the evidence would have been used in a different factual context is without legal consequence. What is critical is that the proposed use of the battered woman syndrome in this case would have been *identical* to the use we have held proper in other cases: to permit the jury to evaluate whether the defendant acted under a reasonable apprehension of harm given the effect of past abuse on that person's perception of harm. Compare the duress statute RCW 9A.16.060(1), with the self-defense statute RCW 9A.16.050(1), both of which require the jury to evaluate the defendant's apprehension of harm from the reasonable point of view of the defendant, knowing what the defendant knows.

Our case law clearly establishes that the chief function of battering testimony is to inform the jury about how severe abuse operates to alter the victim's state of mind in general, and the perception of danger in particular. *See State v. Allery*, 101 Wn.2d 591, 597, 682 P.2d 312 (1984); *State v. Ciskie*, 110 Wn.2d 263, 271-76, 751 P.2d 1165 (1988); *State v. Janes*, 121 Wn.2d 220, 236, 850 P.2d 495 (1993). The rationale underlying its admissibility is the consensus in the relevant scientific community that severe abuse distorts perceptions of harm and its immediacy in ways that are not readily understandable, and may sometimes even be counterintuitive. *See Ciskie*, at 271-74. *See also Janes*, at 236. That is why expert testimony is helpful to the jury: it permits the jury to make an informed evaluation of the factual question whether the defendant indeed acted under the reasonable apprehension of harm given the effects of the abuse experienced. *See Allery*, 101 Wn.2d at 597-98 and articles cited therein.

The testimony sought to be introduced here was offered to explain to the jury the concepts of learned helplessness

and how a battered person assesses danger. Report of Proceedings, at 536-43. These concepts have already been accepted as meeting the *Frye* standard in a variety of contexts. *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923). *See Allery*, 101 Wn.2d at 594-98 (expert testimony on battering syndrome admissible to help the jury evaluate whether the defendant shot her husband believing he posed a danger of imminent harm, taking into account all the circumstances known to her at the time she acted); *Ciskie*, 110 Wn.2d at 272-76 (expert testimony on battering syndrome admissible to help the jury evaluate why a victim of rape would not report the abuse to the police); *Janes*, 121 Wn.2d at 232-36 (expert testimony on battering admissible to help the jury evaluate whether a child shot his stepfather in self-defense).

Thus the fact that Riker and Burke were never involved in a battering relationship or an intimate relationship of any kind is immaterial. If a person's perceptions have become distorted from the effects of abuse, it is not necessarily relevant that the person who triggers the response in a given instance did not commit the abusive acts in the past. As the expert explained in the offer of proof, the effects of abuse on the human psyche cannot be so neatly compartmentalized. *See Janes*, 121 Wn.2d at 232-36. She testified as follows:

Q: You also indicated fear. Would a battered woman assess the danger she is in differently than, say, you or I would?

A: Yes, quite clearly.

Q: *Is that an idea that's scientifically accepted?*

A: *Yes.*

. . . .

Q: Would a battered woman be more susceptible to a threat than a normal person?

A: I believe so, yes.

Q: Why is that?

A: Because of her history and because of the way she assesses fear and intimidation and the fact that she generally has been abused.

Q: Can you separate a person's past relationships out from how they would assess fear in a situation that presented itself now?

A: Well, no, you cannot.

Q: Why is that?

A: Well, because it's impossible to do. I know of no scientific way that you can separate those.

Q: Is there any doubt in your mind that the person's past relationships would play a part in how they assess present danger they would be in?

A: There is no doubt in my mind that past plays a role to the present. Fear is cumulative.

Q: What do you mean by that?

A: I mean that it adds on. One fearful or difficult situation makes those in the future more difficult and apprehensive. It's cumulative in that sense. It's add on.

. . . .

Q: Do you have an opinion as to whether Debbie Riker is a battered woman?

A: I do have an opinion.

Q: How confident are you in that opinion?

A: I am fairly confident. Quite confident. I am confident.

Q: What is that opinion?

A: That indeed she is a battered woman.

Q: Is it your opinion that she was a battered woman in June-July of 1987?

A: Yes, it certainly is.

Q: Tell me briefly why you reached that conclusion?

A: Because of the history that she provided me and because of the situation she found herself in May, June and July of '87.

Q: How does Miss Riker's status as a battered woman relate to her assessment of her own danger in this particular case?

A: Well, I believe that she is not able to clearly assess her own danger and protect herself and her children to the extent that I think would be reasonable and normal.

Q: And how does her status as a battered woman relate to Debbie's inaction and sort of removing herself from this situation?

A: Well, I believe it relates because she saw herself as having no options or exit. That she was simply in a situation and was unable to make a decision to get out.

Q: And when you offered that opinion, is that because of the things that Rupert Burke said about himself and asked Debbie to do?

A: Partially, yes.

Q: And what's the other half of why you reached that conclusion?

A: It's simply she was unable to see another way out of the situation. It doesn't mean she liked doing what she was doing, but she saw no alternative and that's part of the learned helplessness.

Q: And how does [sic] her past relationships with other people play into that situation?

A: Well, she has been very intimidated and very abused and very scared. Her relationship with her stepfather in particular begin [sic] to occur, interestingly enough, when she got good grades, when she did well in school. So her whole attitude toward authority was eroded very early in her life.

Q: Is there any way you can make an assessment as to whether Debbie Riker is a battered woman based only on her relationship with Rupert Burke?

A: No. I think you can't separate out that particular relationship from all the other ones.

Q: Is it your opinion that Debbie Riker was actually fearful for her life when she did these acts?

A: She indicated to me she was and I believe she was fearful for her life. Particularly her sister's life.

(Italics mine.) Report of Proceedings, at 537-43.

Although the jury heard some evidence that Riker had been abused in the past, it was denied the critical information made in the offer of proof: the *relevance* of that past history to her subsequent perceptions of danger and her susceptibility to threats of harm.

The majority's conclusion the evidence should be excluded under the *Frye* test is premised on an unduly narrow view of the evidentiary function of "battered woman syndrome". As the majority acknowledges, battered woman syndrome is a subset of post-traumatic stress disorder, which is defined as "the development of characteristic symptoms following a psychological distressing event that is outside the range of usual human experience." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* § 309-89 (3d rev. ed. 1987). *See State v. Ciskie, supra* at 271-72 and citations therein; *see also* Report of Proceedings (Offer of Proof), at 531. The identity of the abuser is not necessarily germane to the development of this condition.

The majority effectively treats the circumstances in which the battering syndrome evidence has been introduced (the context of a battering relationship) as a general procedural requirement for its admission. This confusion leads the majority to conclude that a proper foundation was not established here, when in fact it was.

We have previously recognized that "[r]esearchers studying battered women *agree* that they share the personality traits characteristic of women suffering from post-traumatic stress disorder". (Italics mine. Citations omitted.) *Ciskie*, 110 Wn.2d at 271. Although typically used to explain why a woman remains in an abusive relationship, battered woman syndrome *describes a psychological condition* produced when a person is repeatedly subjected to severe abuse. *See Ciskie*, at 271-74.

The expert in this case testified that Riker qualifies as a battered woman; that a battered woman would perceive danger differently than would an ordinary person; and that this notion is accepted in the relevant scientific community. I cannot understand what purpose would be served by requiring more in the way of foundation than this.

In sum, the trial court should have admitted the expert testimony because: (1) the witness qualified as an expert; (2) the opinion was based on an explanatory theory culled from studies which are generally accepted in the scientific community; and (3) the testimony would have been helpful to the trier of fact. *See State v. Allery, supra* at 596; ER 702; *see also Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923). Here, the witness was an expert; the explanatory theory about the effects of severe abuse on perceptions of harm is generally accepted in the scientific community, as the expert testified; and the information would have assisted the trier of fact in evaluating Riker's contention that she was afraid to resist Burke.

I would reverse the trial court, and remand for a new trial consistent with the views expressed above.

JOHNSON, J., concurs with UTTER, J.

Reconsideration denied May 9, 1994.