# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

ADRIAN LAWRENCE VANWYCK,

Appellant.

No. 78316-5-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 12, 2019

LEACH, J. — Adrian VanWyck appeals the judgment and sentence imposed for his violation of a no-contact order and challenges three legal financial obligations (LFOs). He claims that the trial court abused its discretion when it rejected his necessity defense and his request for an exceptional sentence below the standard range.

VanWyck fails to show that no reasonable fact finder could find the evidence insufficient to establish a necessity defense. Because the trial court considered and rejected his request for a deviation from a standard range sentence and imposed a standard range sentence, he cannot appeal his sentence. So we affirm in part. Based on his indigency, VanWyck has established his right to relief from the challenged LFOs.

BACKGROUND

Adrian VanWyck is Thomas VanWyck's son.[1] Thomas has three other children, two live in Washington state and one lives in Arizona. In 2014, Adrian sustained head injuries and still suffers from them. That same year, Thomas had the first of several strokes. The strokes rendered Thomas physically fragile and unable to work.

According to Thomas, Adrian helped him "all the time" with car repairs, housecleaning, laundry, and cooking. He did not "feel an obligation to take care of Adrian" but worried that he would not have a place to stay if he did not stay at Thomas's apartment.

In January 2015, Thomas reported Adrian to the police after Adrian hit him on the head with a baseball cap and threw pills at him. He told the responding officers that he was "so scared of Adrian that he sleeps with a kitchen knife in his bedroom." The court convicted Adrian of fourth degree assault, domestic violence. It imposed several conditions, including an alcohol and drug assessment and a domestic violence assessment. It issued a postconviction no-contact order on April 8, 2015, that prohibited Adrian from coming within 150 feet of his father for five years from this date.

Between March 2015 and October 2016, Adrian was convicted of violating the no-contact order six times.[2] In January 2017, the State charged Adrian with

---

[1] For the purposes of clarity, we refer to Adrian VanWyck as "Adrian" and Thomas VanWyck as "Thomas."

[2] Adrian stipulated to these convictions before the trial we are reviewing.

a felony violation of the no-contact order, domestic violence, based on evidence gathered after officers responded to three separate 911 calls made by Thomas's sister Rae Kordes and his neighbor Michael Hatch between the end of December 2016 and January 2017. Hatch called 911 after he checked on Thomas in his apartment because he had not left for work and discovered Adrian drinking beer in the kitchen while Thomas lay in bed "having vomited and urinated on himself." Kordes called twice in response to Adrian's presence at the home when she was caring for Thomas after he had left the hospital.

Adrian was convicted as charged. At sentencing on June 21, 2017, the State recommended a standard range sentence of 51 months, but the court imposed a first-time offender waiver with 90 days of jail time and 12 months of community custody. It ordered him to participate in a chemical dependency evaluation and "abide by all no-contact orders."

The following events led to the charges in this case. On November 2, 2017, Everett police responded to a 911 call from Thomas, who reported that Adrian was at his home and had an outstanding Department of Corrections warrant for his arrest. Officers contacted Thomas at his neighbor's. Thomas gave them access to his apartment, told them that Adrian was inside, and said that the interior doors should all be unlocked. Thomas told the police an incident had occurred that evening that caused him to ask Adrian to leave. Adrian refused. Thomas was afraid of Adrian.

Police found Adrian in Thomas's home behind a locked door and intoxicated. They arrested Adrian on the DOC warrant.[3]

Adrian elected to have his case tried to a judge. Adrian provided this explanation for his presence in his father's home. At the end of October 2017, Thomas called him, speaking incoherently. Adrian went to Thomas's home and found him in bed and extremely debilitated. Adrian stayed with Thomas for several days. During this time, he cared for his father and cleaned up the house. He said he had some knowledge of what to look for and observed his father "progressively getting better over the couple of days."

Adrian did not call an ambulance for Thomas "because of the restraining order" and because he "was waiting to see what would happen." He knew that if he called an ambulance, Thomas "would be angry" because "he doesn't like doctors or hospitals." After a couple of days, Thomas was more mobile and could communicate but still struggled to speak. Because of this, Adrian tried to obtain the phone number of Thomas's doctor. As he searched, his father "started getting aggravated" and "storm[ed] over to the neighbor[']s." Adrian agreed that Thomas called 911 because Adrian refused to leave after Thomas asked him to.

At trial, Adrian admitted that he knew a no-contact order prohibited him from any contact with Thomas. He said that despite this knowledge, he went to

---

[3] The warrant was in place because Adrian failed to comply with the Washington State Department of Corrections requirements.

-4-

his father's house because he was "worried about [his] father's safety and his well-being, his health, knowing his health conditions with the strokes, and knowing that there is pretty much no one else to take care of him." He claimed that "after I got that last phone call, then I knew something was really bad happening."

After the parties presented their cases, the court asked defense counsel what part of what they presented "rises to a defense." Defense counsel said, "[T]he Court heard the testimony. I'm leaving it up to the Court to decide. I understand where the Court is coming from."[4]

The court said,

> I think that [given] the factual scenario that was testified to by the defense, the closest doctrine that it gets to is necessity. I think the State is right about that.
>
> And in order to avail one's self on the defense of necessity, you have to establish by a preponderance of the evidence that you reasonably believed the commission of the crime was necessary to avoid or minimize the harm, that the harm sought to be avoided was greater than the harm that resulted in violation of the law, and that no legal alternative existed.
>
> In this case I am going to find as a matter of law that the defense of necessity was not met.

At sentencing, the defense asked for an exceptional sentence below the standard range based on what it identified as mitigating factors, emotional duress and Thomas's willing participation. The State disagree about both mitigating factors.

---

[4] Earlier, the State characterized defense arguments as possibly "necessity or something akin to that."

After hearing from the parties, the court said that it did not find Adrian's story credible and that it considered him the primary problem. It also noted that the previous court's leniency had not changed Adrian's illegal conduct. It denied Adrian's request and imposed a standard sentence. It ordered him to pay legal financial obligations, including a $200 filing fee, a $100 DNA collection fee, and a $100 domestic violence penalty fee. It noted that the Washington State Patrol Crime Laboratory already had a DNA sample from Adrian.

## ANALYSIS

Adrian raises three issues in this case. First, he claims that no reasonable judge could find that he did not prove the defense of necessity. Second, he asserts that the trial court did not consider his claim that a mitigating factor warranted a sentence below the standard range. Finally, he asks that certain LFOs imposed by the trial court be stricken because he is indigent. Only the last issue has merit.

Defense of Necessity

For purposes of this opinion, we assume, without deciding, that Adrian can raise and did raise necessity as a defense to violation of a court order.[5] To prove necessity, the defendant must establish, by a preponderance of the evidence, "that (1) he or she reasonably believed the commission of the crime was necessary to avoid or minimize a harm, (2) the harm sought to be avoided was

---

[5] The Washington Supreme Court has not addressed whether necessity is available as a defense to violation of a no-contact order. See State v. Yelovich, 191 Wn.2d 774, 780 n.1, 426 P.3d 723 (2018).

greater than the harm resulting from a violation of the law, and (3) no legal alternative existed."[6]

Defendants must prove affirmative defenses like necessity by a preponderance of the evidence.[7] When this court reviews a trial court's conclusion that the defendant failed to prove this defense, we ask "whether, considering the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove the defense by a preponderance of the evidence."[8]

We begin our analysis by noting that Adrian's argument depends to a large degree upon this court accepting Adrian's testimony as true. But the trial court did not find him credible. This court defers to a trial court's decisions about credibility.

Even accepting Adrian's testimony as true, he did not provide evidence that requires a finding of necessity. Adrian stayed at his father's home for several days after any emergency had resolved. During this time he drank to the point of intoxication. This conduct does not rise to a legal necessity as a matter of law.

Adrian also did not establish the absence of reasonable, legal alternatives to his violation of the court order. As the trial court noted, if Thomas needed

---

[6] State v. Gallegos, 73 Wn. App. 644, 651, 871 P.2d 621 (1994) (citing State v. Diana, 24 Wn. App. 908, 916, 604 P.2d 1312 (1979)).
[7] State v. Riker, 123 Wn.2d 351, 366, 869 P.2d 43 (1994).
[8] State v. Lively, 130 Wn.2d 1, 17, 921 P.2d 1035 (1996).

help, Adrian could have called 911 or Adult Protective Services and waited more than 150 feet from Thomas's home until help arrived. The record contains no credible evidence that these alternatives were not available in this case. Indeed, he admitted that he did not call a doctor or an ambulance at least in part "because of the restraining order."

Given these facts, Adrian fails to establish that no rational court could find that he did not establish the three prongs of the necessity defense. The trial court did not err.

Denial of Exceptional Sentence

Adrian contends that the trial court abused its discretion by failing to consider his request for an exceptional downward sentence because Thomas acted as a "willing participant." We conclude he cannot appeal his standard range sentence because the trial court did consider his request.

When a defendant has requested an exceptional sentence below the standard range, "review is limited to circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range."[9] "While no defendant is entitled to an exceptional sentence below the standard range, every defendant is entitled to ask the trial court to consider such a sentence and to have the alternative actually considered."[10] Thus, "[t]he failure to consider an

---

[9] State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997).
[10] State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005).

exceptional sentence is reversible error."[11]   Similarly, we review a trial court's mistaken belief that it lacks the discretion to depart downward from the standard sentence.[12]

The trial court reviewed the sentencing memos and statements during the sentencing hearing, including the defense's assertion that the court should impose an exceptional downward sentence because Thomas was a willing participant.  At sentencing, the trial court directed some observations to Adrian:

> [I]n looking at the material that's been presented by both sides and listening to what transpired at trial, I [wonder] if you knew that you were violating the no contact order, why didn't you just work around it.
>
> And you just said, you know, that you feel compelled to disobey the law.
>
> . . . .
>
> And I am not so sure I understand that kind of thinking, and I don't think it's correct.  And what it does suggest to me is that it's not so much that you choose to disobey the law, it's just that you choose to do what you want.
>
> One thing that sort of stands out for me very powerful[ly], is Judge Fair gave you a first time offender waiver when she didn't really have to do that, and . . . that leniency just had no significance on you at all, whatsoever.
>
> And I don't have anything direct, with regard to this statement, but it seems to me that maybe your siblings don't see your dad because of you, that that's really the problem.  There [are] a couple of things that I read which indicated that, that they don't approve of the relationship that you have or that you established with your dad and so they either don't intervene when you are around or they are afraid to intervene when you are around.

---

[11] Grayson, 154 Wn.2d at 342.
[12] Grayson, 154 Wn.2d at 342.

The court did not find Adrian's story credible. It did not believe Adrian's claims that he was "in this tangled web," that he was "a victim," that it was not his fault, and that it was "just all these things are happening that sort of compel things to transpire a certain way" did not "wash."

It concluded by saying,

> People who take responsibility have a tendency to create order even in a bad situation, so that if there is a no contact order a responsible person can work with that and still create a situation where everything needs to get done. But for you, it's an excuse.
>
> So I am not going to bless that. I am not going to continue to keep continuing to grant you leniency so you can just keep doing this over and over and over again. I'm sorry to your dad that this is going to happen, that he feels that he needs you.
>
> But in this situation from sort of an objective outside observer, I think you are the problem. I don't think you are the solution. And that message needs to be delivered, because apparently a lenient sentence doesn't do it, because you got that already, and it didn't work.

The trial court was aware of its discretion to impose a sentence below the standard range. And it reviewed the materials submitted by the parties that included the memoranda discussing the defense theory that Thomas was a willing participant. The court made clear that it viewed Adrian's behavior solely to be the product of his own choices, indicating that it did not consider Thomas to be driving his son's violation of the no-contact order, as a willing participant or otherwise. Adrian has not established that the trial court refused to exercise its discretion.[13] He cannot appeal his standard range sentence.

---

[13] Garcia-Martinez, 88 Wn. App. at 330.

Legal Financial Obligations

Finally, Adrian challenges the $200 filing fee, the $100 DNA fee, and the $100 domestic violence penalty because the legislature's 2018 modifications to LFO statutes apply to him. We agree.

In 2015, the Washington Supreme Court held that RCW 10.01.160(3) requires sentencing judges to "make an individualized inquiry into the defendant's current and future ability to pay before the court imposes LFOs."[14] Later, in 2018, the legislature passed House Bill 1783 that amended statutes governing the imposition of discretionary LFOs. This law, effective June 7, 2018, amended former RCW 36.18.020(2)(h) (2015) to prohibit trial courts from imposing the $200 court filing fee on indigent defendants.[15] It also eliminated the mandatory $100 DNA collection fee where "the state has previously collected the offender's DNA as a result of a prior conviction."[16]

The legislature did not amend RCW 10.99.080(1) which states that a court "may impose a penalty assessment not to exceed one hundred dollars on an . . . offender convicted of a crime involving domestic violence." But it amended RCW 10.01.160(3) to prohibit sentencing courts from imposing discretionary costs on indigent defendants.[17] RCW 10.99.080 is discretionary and provides that when deciding whether to impose the penalty, "judges are

---

[14] State v. Blazina, 182 Wn.2d 827, 839, 344 P.3d 680 (2015).
[15] LAWS OF 2018, ch. 269, § 6(3).
[16] RCW 43.43.7541.
[17] LAWS OF 2018, ch. 269, § (6)(3).

encouraged to solicit input from the victim or representatives for the victim in assessing the ability of the convicted offender to pay the penalty, including information regarding current financial obligations, family circumstances, and ongoing restitution."[18]

Under State v. Ramirez,[19] these amendments apply to Adrian because his direct appeal was pending on June 7, 2018, the amendment's effective date.[20] He was indigent at the time of sentencing. And the judgment and sentence in this case states that the court did not require DNA testing because the Washington State Patrol Crime Laboratory already had a sample. Because of this, the State concedes that the $200 filing fee and the $100 DNA collection fee should be stricken.[21] We agree and remand for that purpose.

But the State does not concede that the domestic violence penalty should be stricken. It claims that the domestic violence penalty is not a "cost" and so RCW 10.01.160(3) does not apply. It asks this court to view costs as described in RCW 10.01.160(2): "expenses specifically incurred by the state in prosecuting the defendant or in administrating the deferred prosecution program . . . or pretrial supervision." We decline to take such a narrow view of the term "costs." Because the domestic violence penalty fee is discretionary and the 2018 amendment to RCW 10.01.160(3) prohibits sentencing courts from imposing

---

[18] RCW 10.99.080(5).
[19] 191 Wn.2d 732, 747, 426 P.3d 714 (2018).
[20] Ramirez, 191 Wn.2d at 747.
[21] It also states that this court should order the lower court to strike the domestic violence penalty fee but, on the same page, asserts that this court should not order the lower court to strike the fee.

discretionary costs on indigent defendants, we remand for the superior court to strike the $100 domestic violence penalty.

CONCLUSION

We remand for the superior court to strike the criminal filing fee, the DNA collection fee, and the domestic violence penalty fee from the judgment and sentence. We otherwise affirm.

_Leach, J._

WE CONCUR:

_Smith, J._                    _Schindler, J._